Roger WHITE, Respondent,

v.

HENDERSON IMPLEMENT CO., Appellant.

Roger WHITE, Appellant,

v.

HENDERSON IMPLEMENT CO., Respondent.

Nos. WD 48419, WD 48456.

Missouri Court of Appeals, Western District.

April 19, 1994.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 31, 1994.

Application to Transfer Denied Aug. 15, 1994.

Roland P. Walker, Columbia, for Henderson Implement Co.

Paul Trees Graham, Columbia, for Roger White.

Before SMART, P.J., and LOWENSTEIN and FENNER, JJ.

FENNER, Judge.

Appellant, Henderson Implement Company (Henderson), appeals the award of the Labor and Industrial Relations Commission (Commission) which reversed the decision of the administrative law judge (ALJ) denying Roger White's claim for compensation. White also appeals. He claims the Commission erred in denying him compensation for medical care.

The record reflects that White was a small engine mechanic employed at Henderson. On December 29, 1987, at approximately 9:30 a.m., White carried a lawn mower, still in its shipping box, from a shed to the shop at Henderson in order to "set it up" for sale. The shed was approximately 200 feet from the shop and the mower weighed approximately 75 pounds. White began to remove the mower from its shipping box and, as he bent over and lifted it up, he "twitched" his eye. He could not see. He attempted to continue to work, but after an hour, he informed his employer of the injury and sought medical attention.

White was examined by Dr. L.D. Schoengarth, an ophthalmologist, on the day of the incident. On August 22, 1988, White was examined by Dr. King Y. Lee, also an ophthalmologist.

On July 15, 1992, the ALJ entered his award denying employee compensation. The ALJ found that the medical testimony of the two physicians established "no medical causal relationship between the alleged accident and Claimant's condition." White's theory of causation is that he caused a Valsalva maneuver when he bent over and lifted the lawn mower and this caused the loss of vision in his right eye. Dr. Lee described a Valsalva maneuver as "a mechanism that decreased the flow of blood to where it is supposed to go, whether it's actual constriction by pressure physically or pressure by just congestion of something blocking the fluid flow."

The ALJ believed that a Valsalva maneuver was "too temporary" an occurrence to have caused White's condition. White appealed to the Commission which reversed the ALJ's award. The Commission found:

This case revolves around whether or not the claimant's loss of sight in his right eye was caused by the work-related incident on December 29, 1987. There was conflicting testimony between physicians and we find Dr. Lee's opinion to be more credible ... Dr. Lee testified that more probably than not, the Valsalva maneuver had triggered a branch artery occlusion, causing the claimant's disability. His observations were more consistent with branch artery occlusion than a central vessel occlusion. He did indicate, however, that they *could* also be consistent with central venal occlusion. He indicated it was possible for one to experience both a venal and arterial occlusion. Claimant's Dr. Schoengarth, on the other hand, believed a central venal occlu-

sion had caused the optic atrophis. However, Dr. Schoengarth acknowledged that Dr. Lee was in a superior position to opine on whether there had been an arterial occlusion since Dr. Lee had administered the test calculated to best diagnose this particular condition. A workers' compensation claim does not have to establish the elements of the case absolutely, but is sufficient if the elements are shown by reasonable probability founded upon reason and experience, inclining the mind to believe, but leaving room for doubt.

In its sole point on appeal, Henderson argues that the Commission erred in entering its Final Award Allowing Compensation because "the testimony of the physicians does not provide sufficient competent evidence from which a reasonable trier of fact could find that employee's condition resulted from a cause for which the employer would be liable." Specifically, Henderson complains that the evidence "demonstrates that employee's physician was speculating about the cause of the employee's condition and did not relate the alleged cause to the actual condition suffered by the employee, while employer's physician was certain about such cause." Henderson concludes that "the Commission misread the doctors' testimony and misstated the doctors' conclusions in its final award."

Section 287.495, RSMo 1986, sets forth the grounds for setting aside a final award of the Commission as follows: (1) the Commission acted without or in excess of its powers; (2) the award was procured by fraud; (3) the facts found by the Commission do not support the award; or (4) there was not sufficient competent evidence in the record to warrant the making of the award. Henderson's argument on appeal centers around the fourth ground for setting aside the Commission's final award.

■■■ The Commission is charged not only with reviewing the record but, when appropriate, determining the credibility of witnesses and the weight to be given their testimony, resolving any conflicts in the evidence, and reaching its own conclusions independently of the ALJ's findings. *Jones v. Jefferson City School Dist.*, 801 S.W.2d 486,

489 (Mo.App.1990). After the Commission has determined an award in a workers' compensation case, this court will review the Commission's award and not the findings of the ALJ. *Id.* The Commission's final award may be set aside only if there is no substantial and competent evidence to support it or if it is clearly contrary to the overwhelming weight of the evidence. *Id.* at 488.

■■■ This court must view the evidence and legitimate inferences therefrom in the light most favorable to the Commission's award. *Id.* at 488. We will not substitute our judgment on issues of fact for that of the Commission even if we would have made a different initial conclusion. *Lawson v. Emerson Elec. Co.*, 833 S.W.2d 467, 471 (Mo.App. 1992). The Commission is the sole judge of witness credibility and the weight and value of the evidence. *Id.* at 470–71.

■■■ The claimant has the burden of proving all the essential elements of the claim and must establish a causal connection between the accident and the injury. *Fischer v. Archdiocese of St. Louis*, 793 S.W.2d 195, 198 (Mo.App.1990) (citations omitted). The claimant does not, however, have to establish the elements of his case on the basis of absolute certainty. *Id.* It is sufficient if he shows them by reasonable probability. *Id.* "Probable means founded on reason and experience which inclines the mind to believe but leaves room for doubt." *Id.* at 198–99. In a workers' compensation proceeding, all doubts should be resolved in favor of the employee and in favor of coverage, but a claim will not be validated where some essential element is lacking. *Gudde v. Heiman Grain, Inc.*, 830 S.W.2d 574, 576 (Mo.App. 1992).

■■■ In the case at bar, viewing the evidence in the light most favorable to the Commission's award, the evidence was insufficient to show a medical-causal connection between White's employment and the injury. The Commission relied on Dr. Lee's testimony to find causation and his testimony regarding causation amounts to nothing more than speculation.

■ As mentioned above, claimant White's theory of medical causation is that he caused a Valsalva maneuver when he bent over and lifted the mower and this caused a loss of vision in his right eye. Dr. Lee testified by deposition in support of this theory. In his deposition, Dr. Lee stated six times that he was uncertain of the exact cause of White's loss of vision. A medical opinion that an injury might, could or would result from an accident is no more than an assurance that such a result is scientifically possible, and is not substantial evidence that it did occur. *Leavitt v. St. Louis Public Service Co.,* 340 S.W.2d 131, 141 (Mo.App. 1960).

Dr. Lee examined White on August 22, 1988, and at that time, he diagnosed White with "optic atrophy, right eye, etiology."[1] Dr. Lee testified that this meant "I felt there was some damage to the optic nerve, but I did not know the cause of it." This is the first time that Dr. Lee testified that he did not know the cause of White's vision loss.

The following exchange between White's counsel and Dr. Lee then took place:

Q. On the basis of the complaints, history, examination and the medical records that you have reviewed here, Doctor, are you, at this time, able to state a diagnosis for whatever problem it is that Mr. White may have in his right eye? Can you state what is wrong with it?

A. The diagnosis is optic atrophy. *The cause of that optic atrophy, I'm not certain.*

Q. Your diagnosis of optic atrophy, is that based on reasonable certainty?

A. Yes.

Q. Is that a situation that would be consistent with an occlusion, a venal occlusion?

A. It can be; yes.

Q. Can a venal occlusion cause optic atrophy?

A. Yes.

Q. Is optic atrophy a condition which, on the other hand, would be consistent with arterial constriction or closure?

A. Yes.

Thus, at this point in the deposition, Dr. Lee has testified based on medical certainty that White has optic atrophy which would be consistent with either venal occlusion or an arterial constriction or closure. However, Dr. Lee has also testified for a second time that he does not know the cause of White's optic atrophy.[2]

Dr. Lee was then asked whether White had suffered a central retinal vein closure.[3] Dr. Lee responded, "When I saw him, I did not see any signs of any previous condition that caused it. All I saw was the effects of whatever it was to the optic nerve. Whatever caused it was not visible at the time." Thus, for a third time, Dr. Lee has testified that he does not know the cause of White's optic atrophy.

Dr. Lee was then asked to respond to a hypothetical. In answering the hypothetical, Dr. Lee was asked to consider White's medical history and complaints, the medical rec-

---

1. "Optic atrophy" is "[a]trophy of the optic nerve." Blakiston's Gould Medical Dictionary 952 (4th ed. 1979). An "atrophy" is "[a]n acquired local reduction in the size of a cell, tissue, organ, or region of the body, which may be physiologic or pathologic." *Id.* at 134. "Etiology" is "[t]he science or study of the causes of disease, both direct and predisposing, and the mode of their operation." *Id.* at 472.

2. The first, third, and sixth times Dr. Lee testified that he did not know the cause of White's optic atrophy, it was based only on his examination of White. However, his examination of White included White informing him that the injury occurred when he bent over and lifted a heavy object. This time, Dr. Lee's opinion was based on the complaints, history, examination and the medical records that he reviewed which included

the medical records of Dr. Schoengarth, Dr. Yang, and Dr. Wolken.

3. Dr. Lee described a central retinal vein closure or occlusion as follows: "[A] vein is a blood vessel that returns blood from the tissues toward the heart and if anything compresses it or occludes the opening of the vessel, then the blood and serum cannot get back where it's supposed to go and then there's congestion and in this particular situation, if it's a retinal vein occlusion, then the blood is getting out to the retina, but it cannot get out—getting into the retina, but cannot get out of the retina. So there's congestion and the blood vessels get engorged and they leak, there is some swelling in the retina, there's bleeding in the retina and along with this, there is some decrease in vision."

ords he reviewed, and his examination of White. Dr. Lee was also asked to assume the following: 1) that prior to the accident of December 29, 1987, White suffered some optic neuritis[4] and had not experienced any loss of central visual acuity in either eye; 2) that prior to the accident, White did not suffer from diabetes, heart trouble, kidney problems or stroke; 3) that White carried a box containing a lawn mower and weighing approximately 75 pounds on his shoulder a distance of some 200 feet from a warehouse to a shop, where he placed the box down on the floor and opened it; 4) that while lifting the mower White experienced a "sudden and immediate twitching sensation in the right eye and ... at the instant, he suffered the full extent of the sight loss" that Dr. Lee observed; 5) that while White was lifting the lawn mower or straining to lift the lawn mower, he did a Valsalva maneuver and experienced a branch artery occlusion. Based on these assumptions, Dr. Lee was asked whether White's act of lifting the mower either caused or contributed to White's loss of vision. Dr. Lee responded, "Given the circumstances there just as stated, *it's possible* under those specific circumstances for this to happen, to relate to cause the circumstances to follow to lead to optic atrophy that I saw on the day of my examination." Dr. Lee testified that this would be based on medical certainty if everything was as counsel said it was.

Dr. Lee was then asked another version of the hypothetical which is as follows:

Q. Well, Doctor, assume this, and basically, this is a pared down version of what I've just asked you. Assume that the vision loss as described to you by Mr. White and as observed to you, occurred immediately and suddenly with the Valsalva maneuver, contemporaneously with it, not later, but contemporaneously with it. Can you state whether more likely than not, the Valsalva maneuver precipitated this event?

* * * * * *

A. Can you say it back?

Q. Okay. I want you to assume that the loss of sight which you observed and which Mr. White described to you, occurred immediately, instantaneously and contemporaneously with the Valsalva maneuver that I described to you. Assuming that, can you state, is it more likely than not that the Valsalva maneuver precipitated the loss of sight that you have observed?

* * * * * *

A. Yes.

Q. Is your answer based on reasonable medical certainty?

A. *Let me qualify it by saying that it is based on reasonable medical certainty, but the exact mechanism, I cannot explain because I don't know.*

Dr. Lee's testimony was once again confusing and inexact. Furthermore, for the fourth time on direct examination, Dr. Lee stated that he did not know the cause of White's loss of vision. White's direct examination of Dr. Lee did not establish causation.

During cross examination, Dr. Lee was asked the following questions:

Q. Is it speculation on your part that the lifting of the lawn mower caused Mr. White's eye problem?

A. Can you define speculation?

Q. Well, let me go this way with it, Doctor. If the testimony and evidence is different than the hypothetical that Mr. Graham asked you, then your answer would be different. Is that right?

A. Yes.

Q. Your answer then is based simply on his hypothetical. Is that correct?

A. Yes.

Q. Now, the main thing, I think, that you are concerned with is the Valsalva movement. Is that right?

A. I'm not certain what you mean.

---

**4.** "Optic neuritis" is defined as "[a]cute impairment of vision in one eye or both, which may be affected simultaneously or successively, and which may recover spontaneously or leave the patient with a scotoma or scotomas, or even blindness. Usually due to demyelinative disease, sometimes to a toxic or nutritional disorder." Blakiston's Gould Medical Dictionary 952 (4th ed. 1979).

Q. Is that the main linking factor, as far as you're concerned, the Valsalva movement?

A. To?

Q. To tying his problem with his eye into his work?

A. *I don't know if it's the main factor. I don't know if there's one thing you can say is the main factor. They are all factors and I don't know how much—which is more pertinent than the other to cause the thing.*

Thus, for the fifth time, Dr. Lee testified that he did not know the cause of White's loss of vision. Dr. Lee was then asked the following:

Q. Assume that he was not doing a Valsalva movement at the time he experienced the loss of sight. Would you then feel that his eye problem was connected with his work?

A. With what other coexisting things?

Q. Just walking around, pushing a lawn mower, bending over, cleaning it up.

A. Without any central retinal changes in the circulation or without any optic neuritis, without anything else, if he were just walking down the street, I'm trying to see if this is what you're meaning, could he just have this spontaneously?

Q. Yes.

A. It's possible for a person to develop something like that spontaneously. We usually see these in older individuals with other problems.

Q. Now, your clinical impression when you first saw Mr. White was optic atrophy. Is that right?

A. Correct.

Q. You had right eye etiology. In other words, you don't know what caused the atrophy. Is that correct?

A. Correct.

This is the sixth time that Dr. Lee admitted that he did not know what caused the optic atrophy in White's eye.

The following exchange then took place:

Q. What causes atrophy?

A. Well, there are any number of things. It could be loss of circulation. It could be trauma. It could be inflammation and infections. Almost any kind of thing could cause atrophy.

Q. But in Mr. White's case, you don't know what the cause of the atrophy was. Is that correct?

A. At that time, I had no definite cause in my mind, other than from the history that he gave and what I saw to relate it to; yes.

Dr. Lee then testified that "the lifting maneuver that he did, did not appear to be the only cause of whatever process it was that caused him to lose the optic nerve or cause an optic nerve atrophy. Generally, I would say you need to have something else in addition to a Valsalva maneuver to cause this type of problem." Dr. Lee also admitted that in his twenty-odd years of practice, he has never seen a patient who has lifted something with a Valsalva maneuver and had a central retinal arterial occlusion. He also testified that he has not read any medical literature that states that lifting causes a central retinal arterial occlusion or central retinal vein occlusion or a branch occlusion.

Dr. Lee was then asked whether central retinal arterial occlusion is caused by disease. He responded, "[t]he artery occlusion is caused by something. Whether it's a disease or a situation, it doesn't happen by itself."

Q. Usually, it's caused by a disease process; isn't it, Doctor?

A. Yes.

Dr. Lee's testimony, taken as a whole, amounts to no more than an assurance that it is scientifically possible for White's loss of vision to have been caused by the actions of bending and lifting the mower. *See Hunt v. Armour & Co.*, 345 Mo. 677, 136 S.W.2d 312, 318 (1939). Dr. Lee's testimony tended to show other causes that might or could have caused White's injury. He testified that he does not know the exact mechanism which caused White's loss of vision. "The rule is that the burden of proof rests on the claimant in a workmen's compensation proceeding, and it is not sufficient for recovery to show only that the injury complained of resulted either from one or the other of two causes, for one of which, but not the other, the

employer would be liable. The claimant must produce evidence from which it reasonably may be found that such injury resulted from a cause for which" Henderson would be liable. *Griggs v. A.B. Chance, Co.,* 503 S.W.2d 697, 704 (Mo.App.1973). No such evidence was presented in this action because Dr. Lee's testimony is not sufficiently definite to constitute substantial evidence that White's loss of vision is attributable to work. The Commission's award is based on speculation and conjecture and it is hereby reversed. Because White did not prove causation, he is not entitled to compensation for medical care. *Brown v. Hillhaven Convalescent Center,* 776 S.W.2d 47, 52 (Mo.App.1989). Accordingly, this cause is remanded to the Commission for judgment to be entered affirming the order of the ALJ.

All concur.