David **ROBERTS,** Claimant–Appellant,

v.

**MISSOURI HIGHWAY AND TRANSPORTATION COMMISSION, Employer/Insurer–Respondent.**

**No. 27109.**

Missouri Court of Appeals, Southern District, Division Two.

May 18, 2007.

**2.** References to statutes are to RSMo 2000 unless stated otherwise.

Bradley L. Bradshaw, Springfield, MO, for Appellant.

William D. Powell, Springfield, MO, for Respondent.

JEFFREY W. BATES, Chief Judge.

David Roberts (Claimant) appeals from a final award entered by the Labor and Industrial Relations Commission (the Commission), arising from a claim for workers' compensation by Claimant against his employer, the Missouri Highway and Transportation Commission (Employer), for an injury sustained in a work-related traffic accident. Claimant contended this accident rendered him totally and permanently disabled. The Commission found that Claimant only sustained a permanent partial disability of 20% of the body as a whole. On appeal, Claimant argues the Commission erred because: (1) the Commission implicitly determined Claimant sustained further injury to his back after the work accident, and this determination is not supported by expert medical opinion; and (2) the award is otherwise not supported by substantial and competent evidence and is against the great weight of the evidence because Claimant's evidence was more credible than that presented by Employer. We affirm.

## I. Factual and Procedural Background

On September 29, 1997, Claimant was driving a dump truck on Highway 60 from Ava, Missouri, to Springfield, Missouri, in the course of his employment. He was wearing his seatbelt. Near Springfield, he encountered a tractor-trailer unit that was blocking both westbound lanes of traffic. To avoid a collision, Claimant drove the dump truck into a very shallow ditch adjoining the right-hand shoulder of the road. He was bounced against the door and his seatbelt. Claimant's supervisor, David Bybee, arrived within two minutes. The dump truck was undamaged. Bybee inquired about Claimant's condition, and he reported no injuries. Nevertheless, Bybee asked Claimant to go to the emergency room because it was company policy for all employees to get checked after an accident. Claimant said it was unnecessary, but he agreed to go. He got back into the dump truck and drove himself to Cox South Hospital in Springfield. At the emergency room, Claimant complained of soreness in his wrists, neck and back.

The emergency-room doctor recommended that Claimant be off work until released and scheduled him to see Dr. Berner in the occupational medicine department. Claimant received treatment from Dr. Berner from October 1 through October 16, 1997. Claimant was then referred by Dr. Berner to a neurosurgeon, Dr. Mark Crabtree, for treatment.

Dr. Crabtree first saw Claimant on October 22, 1997. At that time, he was complaining of headaches, neck pain and back pain. Dr. Crabtree ordered a CT myelogram and flexion/extension films. These studies were performed on October 31, 1997. They revealed a grade I spondylolisthesis at L5–S1 and a disc that was slightly bulging to the left at the L4–L5 level.[1] As shown by the myelogram, however, the slight disc bulge was having no effect on the nerve roots. Claimant's back pain was being caused by his spondylolisthesis, which produced mechanical instability across the L5–S1 segment. Dr. Crabtree initially recommended a conservative course of treatment, consisting of a weight loss and conditioning program.

---

1. Spondylolisthesis is the slippage of one bony segment of the spine across another. This condition is graded from I–IV, with grade I being the least severe. A grade I spondylolisthesis indicates a slippage of 25% or less. Claimant's spondylolisthesis predated his September 29, 1997 accident because the same condition was noted in a 1996 x-ray, but the accident made that condition "slightly worse[.]"

From late December 1997 through early January 1998, Claimant participated in a work conditioning and strengthening program overseen by physiatrist Dr. Jeffrey Woodward. On January 5, 1998, Claimant was released to return to work full time. He did so, but he continued to report pain in his back and left leg. For the next month, Claimant used a transcutaneous electrical nerve stimulation (TENS) unit prescribed by Dr. Woodward. This device helped him sleep better, but he still reported back and left leg pain. Dr. Woodward diagnosed Claimant as having chronic L5 disc pain without exhibiting any objective evidence of nerve root injury or abnormality.

A magnetic resonance imaging scan (MRI) done on March 23, 1998 showed Claimant continued to have a grade I spondylolisthesis, but this condition had no effect on the nerve roots across that segment. Dr. Crabtree recommended that Claimant undergo a lumbosacral fusion using pedicle screws and rods. The surgery was performed on April 23, 1998.

After surgery, Claimant was placed in a back brace. Radiological studies performed on June 16, 1998 showed that the instrumentation was in proper position and that the L5–S1 joint appeared to be fusing. Claimant was relatively asymptomatic and had little back pain. Additional radiological studies in September 1998 showed a stable fusion of the L5–S1 joint. Claimant began increasing his activity level. By October 13, 1998, Claimant had completed a work conditioning program without his brace. Dr. Crabtree authorized Claimant to undergo strength training and lift objects weighing more than 60 pounds. On November 11, 1998, Claimant returned to work full time. He continued to do well. On December 4, 1998, Dr. Crabtree released Claimant to return to work full time with no restrictions.

On December 28, 1998, Dr. Woodward examined Claimant in order to prepare a report and rating. Dr. Woodward noted that Claimant had been doing "full-time, regular work duty" and had lifted up to 100 pounds since being released by Dr. Crabtree. Dr. Woodward recommended a permanent partial disability of 15% for the body as a whole for Claimant's injury. Claimant's claim for workers' compensation benefits was filed on January 27, 1999.

Claimant and his first wife, Sonja Hubbard, lived on a 32–acre farm in Hartville, Missouri. The couple separated in March 1999 and divorced in May 1999. From the time that Claimant returned to work until the separation occurred, Sonja observed that Claimant walked fine. He did not limp or drag his foot. He was able to work full time, help around the house and do yard work without taking any medication. He did not complain about any pain in his back or legs. The couple owned eight horses, and they both rode them. When Sonja was working, Claimant took care of the horses. Every other day, he loaded one to two 50–pound bags of grain into a truck and took them into the pasture to feed the horses. He then unloaded the bags and emptied them into different piles so the horses could eat. Claimant was able to perform this task without any complaints of pain or numbness. When the couple separated, Claimant appeared to be "perfectly recovered." He was able to fish, hunt and go horseback riding.

In March or April 1999, Claimant spent a week as a substitute worker at the stockyards in Lebanon, Missouri, in place of Tom Hubbard. On one of those days, Claimant worked with Walter Beard. Beard recalled that Claimant arrived at 8:30 a.m. and brought two horses with him. At 10:00 a.m., Claimant and Beard spent 30 to 45 minutes moving pigs, goats and

calves into their proper pens. This work was done on foot and involved some running. Thereafter, Claimant helped pen cattle once they had been sold. This work was done on horseback and required the rider to trot, lope or run in order to keep pace with the cattle as they left the sale barn. Claimant saddled his own horse and worked from 10:30 a.m. straight through until approximately 3:00 p.m. During that time, he used both of the horses that he had brought. The work was very strenuous, but he never walked with a limp or complained of being in pain.[2]

In April 1999, Claimant participated in a recreational activity called "team penning" with Hubbard. He described this activity in the following way:

> Team penning. Very aggressive sport on horseback. You got roughly 30 head of cattle at one end of the arena. Every third cow has got the same number on it. They've got a pen down here at this end of the arena. You run down. The halfway mark is the foul line. You cross that line. They call out a number. You go down and pick out those three cows as fast as you can because you're on a time limit. And you run down there. And you cut out a cow and run him down. Whoever's next or closest to the [herd] picks out another one and just keeps them going until you get them all back in a minute and a half time. It's very fast-paced. You have to hang on real good with your legs, balance yourself as much as possible or otherwise you end up in the dirt. It's a very aggressive game.

This sport is very strenuous on the rider because the horse may be trotting fast, loping or galloping as the rider attempts to cut a cow from the herd. Claimant was able to participate in this activity without difficulty or complaint. In addition, Claimant saddled his own horse. To do so, he had to throw a 40–pound saddle up on his horse's back and cinch it down himself. He also mounted and dismounted his horse without difficulty, using his left leg and arms to pull his entire weight up onto and off of his horse.

On June 18, 1999, Claimant was sent by his attorney to see Dr. Bradley Townsend, a family practitioner. Claimant complained of chronic, severe low back pain and occasional incontinence and bowel problems. Dr. Townsend was not told by Claimant that he had been riding horses. Dr. Townsend would not have recommended that activity for someone in Claimant's condition because "it is certainly possible that riding a horse could cause back problems."

In June or July 1999, Claimant helped Tom Hubbard lift up the detached bed of a Mazda pickup truck. The bed weighed 250 to 300 pounds. Together, Claimant and Hubbard raised the bed up over their heads. Claimant was able to do this without complaint.

Sometime during the summer of 1999, Walter Beard was at a convenience store in Lebanon when he observed Claimant getting gas. As Claimant came toward the store to pay, he walked normally and did not limp or drag his leg. As soon as he saw Beard, however, Claimant started limping.

Around September 1, 1999, Claimant stopped working. According to Claimant, he did so because his pain got so bad that he had to quit. He saw Dr. Woodward on

---

**2.** Claimant also came to the sale barn on another occasion while Beard was working. This occurred either shortly before or shortly after Claimant substituted for Hubbard. While there, Claimant said he had been thrown from his horse. He lifted up his shirt, and Beard observed a bruise on Claimant's back.

September 7, 1999 and complained of having frequent, moderate pain in his back and left leg for the past four to six months. He described having occasional left foot drop, as well as a new symptom of abruptly having both legs give way while walking. One week later, Claimant underwent nerve conduction and electromyography studies. The results of both studies were normal.

On October 1, 1999, Claimant married his second wife, Theresa. The ceremony was performed at an outdoor arena with the bride and groom on horseback. While riding around the arena at the conclusion of the ceremony, Claimant was thrown from his horse. Robert Reeves testified Claimant "got up cringing" and was "kinda hurt." Deborah Schaffer also attended the wedding and observed Claimant being thrown from his horse. Based on her observations of Claimant, Schaffer could tell "he was hurt. And he was limping, you could tell that." Claimant was off his horse approximately five minutes trying to "shake it off."

Claimant was seen by Dr. Woodward again on October 14, 1999. On that occasion, Claimant was complaining of very severe low back pain and radiating leg discomfort. A recent contrast MRI, however, showed nothing other than typical post-surgery findings with no significant new abnormality. During the physical examination, Dr. Woodward performed three maneuvers (spine axial compression, trunk rotation and skin rolling) called Waddell signs. These maneuvers do not cause or aggravate pain in a patient's lumbar spine in any physical way. Claimant reported significant discomfort when each test was performed. These positive Waddell signs indicate symptom magnification or exaggeration. Claimant limped markedly throughout the examination, but Dr. Woodward found no palpable muscle spasm or leg muscle atrophy. Claimant's subjective verbal complaints were getting progressively worse in the absence of any objective physical or neurologic changes or abnormalities. Nevertheless, Dr. Woodward adjusted his rating because of Claimant's subjective complaints of unremitting back and leg pain. Dr. Woodward recommended a permanent partial disability of 20% for the body as a whole for Claimant's injury.

On March 7, 2000, Claimant was sent by his attorney to see another neurosurgeon, Dr. Paul Arnold. Claimant complained of back pain, bilateral lower extremity pain and left leg weakness. Dr. Arnold's physical examination of Claimant revealed nothing abnormal, other than some giveaway weakness in his left lower extremity and some pain on bending forward. Dr. Arnold reviewed Claimant's prior CT scans, MRIs and x-rays and saw no indication of a herniated disc. Claimant was advised to obtain dynamic x-rays and a post-myelogram CT scan. After reviewing these diagnostic studies, Dr. Arnold advised Claimant that he did not have a compressive lesion (i.e., something abnormal pressing on a nerve root or the spinal cord) or herniated disc that required any additional surgery.

In May 2000, Claimant was seen by Dr. Crabtree. Earlier x-rays showed no problems with Claimant's surgical instrumentation. An October 1999 MRI showed no spondylolisthesis, significant bulging discs or encroachment on the nerve roots. Claimant's fusion was stable. Dr. Crabtree saw no indication for further surgery. Claimant never told Dr. Crabtree about riding horses. He would not recommend that a person with a lumbar fusion engage in that activity.

Dr. Woodward performed another examination of Claimant on June 16, 2000. The history he provided included the following: (1) constant daily significant low

back pain that measured eight to nine and one-half on a ten scale; (2) constant left leg pain; (3) only being able to sit for 10–15 minutes; (4) increased back and leg pain after walking only 10 minutes; (5) abrupt bilateral numbness in both legs; (6) left foot drag; (7) abrupt falls while walking on level ground; and (8) not being able to stand up straight. During the physical examination, Dr. Woodward noted that Claimant made "very awkward, atypical, dramatic physical maneuvers, with grimacing and apparent exaggerated pain display." The three Waddell signs were positive. Claimant had no leg muscle atrophy or wasting on either side, and he had excellent calf muscle bulk and tone. He had "breakaway" weakness in all left leg muscles, which indicated that he was exaggerating the weakness in those muscle groups for reasons unrelated to pain. Dr. Woodward concluded that Claimant was exhibiting "obvious pain magnification behaviors" without any associated confirmatory objective findings. Dr. Woodward determined that Claimant was medically stable, which meant that he had been given adequate and complete medical evaluations and had been provided with all reasonably necessary medical treatment. Dr. Woodward did not "anticipate any significant change directly related to the work injury to occur in the future, without some new significant intervening reinjury or new injury." In his opinion, Claimant "was not a good candidate for any repeat surgery, based primarily on his marked exhibition of symptom magnification during my final examinations, which are typically associated with less reliable pain relief from spine surgery."

From June through August 2000, Claimant's wife, Theresa, worked for Robert Reeves selling shoes from street corners and parking lots. She sold shoes from Thursday through Sunday. On each of those days, Reeves would receive about 100 cases of shoes to sell. Each case held 12 pairs of shoes and weighed about 30 pounds. Claimant would help unload the cases from the delivery trailer and then load about 50 cases onto his own trailer. Theresa did not assist in that process due to recent hernia surgery. Claimant also helped set up the display stand at the various sites where the shoes were sold. To do so, Claimant had to unload each case from his trailer, place it on a large table and pull out one shoe to display. Reeves had doubts about whether Claimant was legitimately unable to work because of back pain. Therefore, Reeves would sneak around and watch him. He observed that Claimant had a funny limp and dragged his toe, but "the minute he knew nobody was around, perfect. He walked perfect."

In September 2000, Claimant was sent by his attorney to see a third neurosurgeon, Dr. Frank Coufal. In relating the history of the accident, Claimant could not say whether he was tossed or thrown about in the vehicle due to "transient amnesia" about the events.[3] Dr. Coufal assumed it had been "a very severe accident." Claimant reported pain primarily in his right leg, numbness and weakness in his left leg and left foot drag. Dr. Coufal decided that Claimant's March 23, 1998

---

3. In contrast, Claimant was able to provide such details during the January 2004 hearing before the administrative law judge. According to Claimant, his head hit the ceiling of the truck cab "very hard," and he was bounced against the door and seatbelt. His inability to recall such details in September 2000 made Dr. Coufal suspect Claimant had a transient loss of consciousness during the collision. Dr. Coufal had not been provided with any of Claimant's clinical records prior to March 23, 1998. Evidently, he was unaware that, in the history provided to the emergency-room doctor, Claimant "denie[d] any head injury and loss of consciousness."

MRI showed a herniated disc at the L5–S1 level.[4] Claimant had another MRI done on September 22, 2000. The radiologist who viewed that MRI concluded it did not show either a herniation or significant disc bulge at the L5–S1 level. When Dr. Coufal reviewed the same MRI, however, he interpreted it to show a moderate paracentral L5–S1 disc herniation. He diagnosed Claimant as having "failed back syndrome secondary to an inadequate neural decompression at the time of his first surgery."

On March 8, 2001, Dr. Coufal operated on Claimant a second time. He performed an L5 laminectomy and an L5–S1 diskectomy. According to Dr. Coufal, he found and removed an L5–S1 disc herniation during that procedure. In his opinion, Claimant's motor vehicle accident on September 29, 1997 caused this disc herniation. He had not been told, however, about Claimant's history of riding horses, being thrown from a horse, working at a livestock auction on horseback, rounding up cattle on horseback or chasing livestock on foot. All of those activities could potentially cause a herniated disc. Generally, patients who have undergone prior spinal surgery should not engage in activities involving "any rapid twisting, with potential flexion or hyperextension of the back. Those particular activities are more risky for patients developing disc problems." If Claimant had engaged in all of the above-mentioned activities, Dr. Coufal acknowledged he would want to know that information in arriving at a conclusion about what caused Claimant's disc herniation. Based on the way Claimant appeared during his first clinical examination, however, Dr. Coufal opined that it would have been difficult for Claimant to engage in any such activities.

Dr. Woodward saw Claimant for the last time on September 3, 2003. Claimant reported that his condition was steadily deteriorating in spite of the second surgery by Dr. Coufal. According to Claimant, his low back and leg discomfort had worsened significantly without any reported re-injury. Claimant said he was experiencing very severe pain three or four days per week, and he was using a motorized wheelchair rather than walk for prolonged periods. He could not leave the house at all without taking narcotic medication. During the physical examination, Claimant again exhibited breakaway weakness in both legs and positive Waddell signs, which indicated that he was exaggerating his symptoms. In Dr. Woodward's opinion, the diskectomy performed by Dr. Coufal had been neither necessary nor successful because it produced no improvement in Claimant's functional abilities. Claimant's rating remained unchanged at 20% permanent partial disability for the body as a whole. Dr. Woodward also held the view that Claimant's horseback riding and lifting 30–pound cases of shoes in 1999 and 2000, which were unrelated to his work for Employer, contributed to his increased lumbosacral and leg pain symptoms and could have caused a lumbar disc herniation.

By January 2004, Claimant said his back pain was getting worse. He took narcotic pain-killing drugs every day, and he used a cane to walk. Dr. Townsend had prescribed a wheelchair for Claimant, which he had used about 50 times around the house. At least five days per week, Claimant would lie down all day due to pain in his back and legs. Dr. Townsend opined

---

4. During Dr. Coufal's videotaped deposition, he pointed out the specific area of the MRI where he saw a herniated disc. After watching the videotape, Dr. Crabtree testified that Dr. Coufal was pointing to normal venous material with contrast in it. Dr. Crabtree saw nothing in the MRI that would require additional surgery.

that Claimant was permanently and totally disabled as a result of the September 29, 1997 accident.

On January 12 and 14, 2004, a hearing was held before the administrative law judge (ALJ). The testimony of Claimant, Sonja Hubbard, Walter Beard, Tom Hubbard, Theresa Roberts, Robert Reeves, Deborah Schaffer and David Bybee was presented in person. The testimony of Drs. Crabtree, Woodward, Arnold, Townsend and Coufal was presented by deposition, and a number of medical records were introduced in evidence. The facts recited above were drawn from these sources.

The ALJ found that the September 29, 1997 accident only caused Claimant's injuries and disabilities up to December 28, 1998, when he was rated by Dr. Woodward. Any claimed injuries or disabilities that purportedly occurred after that date were not caused by the accident:

> I come to this conclusion based on several factors. First of all, Dr. Crabtree examined [Claimant] on September 1, 1998, and felt his fusion was stable. Second, is the opinion of Dr. Woodward that the claimant was showing symptom magnification. Third was the opinion by Dr. Crabtree and Dr. Arnold, both of which are neurosurgeons, as well as Dr. Woodward's opinion that there was no basis for performing additional surgery on the claimant after he worsened in September 1999. [Fourth] is the sheer amount of time that transpired between the release from the initial surgery in December 1998 and the many things that were occurring in the claimant's life during this time. He was riding horses, penning cattle, moving large items such as the pickup bed, and lifting at work up to at least 100 pounds by his history. And last of all, I find that he was thrown from the horse at his wedding. I simply

do not find it credible that the problems he experienced after December 28, 1998, and the degree to which he purported to experience them, are related to his work injury on September 29, 1997.

In reaching that conclusion, the ALJ relied on the opinions of Drs. Crabtree, Woodward and Arnold. "[Claimant] did have a back injury, which was treated and he was released in December 1998. I do find that the portion of his injury documented up to December 1998 is work-related. Any additional problems he experienced after that date I do not find were work-related." Claimant was found to have "sustained a permanent partial disability of 20% of the body as a whole as a result of this injury."

Claimant then applied for review of the ALJ's decision by the Commission. On June 14, 2005, the Commission issued its final award allowing compensation. It affirmed the ALJ's decision and adopted her findings. The Commission found that "the ALJ correctly weighed and evaluated the lay and medical testimony in reaching her conclusions as to disability, credibility and causation." This appeal followed.

## II. Standard of Review

■ Because the Commission adopted the ALJ's findings and decision, we will review them in this appeal from the Commission's final award of compensation. *Hawthorne v. Lester E. Cox Medical Centers,* 165 S.W.3d 587, 592 (Mo.App.2005); *Birdsong v. Waste Management,* 147 S.W.3d 132, 137 (Mo.App.2004). The scope of our review is limited:

> Upon appeal no additional evidence shall be heard and, in the absence of fraud, the findings of fact made by the commission within its powers shall be conclusive and binding. The court, on appeal, shall review only questions of law and may modify, reverse, remand for rehearing, or set aside the award upon any of the

following grounds and no other: (1) That the commission acted without or in excess of its powers; (2) That the award was procured by fraud; (3) That the facts found by the commission do not support the award; (4) That there was not sufficient, competent evidence in the record to warrant the making of the award.

§ 287.495.1 RSMo (2000). "Whether the award is supported by competent and substantial evidence is judged by examining the evidence in the context of the whole record." *Hampton v. Big Boy Steel Erection,* 121 S.W.3d 220, 223 (Mo. banc 2003). Only in rare cases will we find an award by the Commission to be contrary to the overwhelming weight of the evidence. *McCutchen v. Peoplease Corp.,* 195 S.W.3d 421, 424 (Mo.App.2006); *Gibson–Knox v. Classic· Print,* 184 S.W.3d 201, 202 (Mo. App.2006).

■ On appeal, we defer to the Commission on issues involving the credibility of witnesses and the weight to be given their testimony.[5] *Birdsong,* 147 S.W.3d at 137; *Pavia v. Smitty's Supermarket,* 118 S.W.3d 228, 234 (Mo.App.2003); *Chatmon v. St. Charles County Ambulance Dist.,* 55 S.W.3d 451, 455–56 (Mo.App.2001). Commission decisions that are interpretations or applications of law, on the other hand, are reviewed for correctness without deference to the Commission's judgment. *Orr v. City of Springfield,* 118 S.W.3d 215, 217 (Mo.App.2003); *Maxon v. Leggett & Platt,* 9 S.W.3d 725, 729 (Mo.App.2000). We independently review questions of law. *Johnson v. Denton Constr. Co.,* 911 S.W.2d 286, 287 (Mo. banc 1995).

## III. Discussion and Decision

■ In Claimant's first point, he contends the Commission erred in not finding him permanently and totally disabled because the Commission must have implicitly determined that he sustained further injury to his back after December 28, 1998, but no doctor expressly so testified. According to Claimant, this violates the principle that opinions about medical causation outside the understanding of lay persons must be supported by expert medical opinion. This argument lacks merit because its underlying premise is unsound.

■ It was Claimant's burden to prove that an accident occurred and that it resulted in injury to him. *Clark v. FAG Bearings Corp.,* 134 S.W.3d 730, 734 (Mo. App.2004); *Thorsen v. Sachs Elec. Co.,* 52 S.W.3d 611, 619 (Mo.App.2001). "For an injury to be compensable, the evidence must establish a causal connection between the accident and the injury." *Clark,* 134 S.W.3d at 734; *White v. Henderson Implement Co.,* 879 S.W.2d 575, 577 (Mo.App. 1994). Thus, Claimant bore the burden of proving all the essential elements of his claim, including causation. *Lawrence v. Joplin R–VIII School Dist.,* 834 S.W.2d 789, 793 (Mo.App.1992).

The medical theory advanced by Claimant was that he sustained a herniated disc in the accident, which ultimately rendered him totally and permanently disabled. Claimant's theory was supported by medical testimony from Drs. Coufal and Townsend. The opposing medical theory advanced by Employer was that: (1) Claimant was involved in a minor automobile accident on September 29, 1997; (2) his only significant injury was a slight worsening of his pre-existing spondylolis-

5. In that regard, we note that all of the expert testimony in this case was presented by way of deposition. When witnesses are deposed and do not testify live before the ALJ, the Commission is just as able as the ALJ to determine credibility from the written record. *Thorsen v. Sachs Elec. Co.,* 52 S.W.3d 611, 619 (Mo.App.2001).

thesis; (3) this mechanical instability in his spine was successfully treated by fusion surgery; (4) the disability caused by this injury ceased when he was released to return to full-time work without restrictions on December 28, 1998; and (5) his numerous subjective complaints to various physicians after that date were not supported by objective findings and demonstrated symptom magnification. Employer's theory was supported by medical testimony from Drs. Crabtree, Arnold and Woodward.

■ These conflicting medical theories presented a credibility determination for the Commission to make. "[D]eciding which one of two conflicting medical theories it should accept is a determination particularly for the Commission. A determination of what weight it will accord expert testimony on matters relating to medical causation lies within the Commission's sole discretion and cannot be reviewed by this Court." *Aldridge v. Southern Missouri Gas Co.,* 131 S.W.3d 876, 882 (Mo. App.2004) (citation omitted). Therefore, the Commission's decision to believe the testimony of Employer's experts is binding on us. *See, e.g., Messex v. Sachs Elec. Co.,* 989 S.W.2d 206, 211 (Mo.App.1999); *Bruflat v. Mister Guy, Inc.,* 933 S.W.2d 829, 835 (Mo.App.1996); *Sommer v. Sommer & Hartstein,* 888 S.W.2d 398, 399 (Mo.App. 1994).

The Commission (via the adopted findings of the ALJ) identified five factors supporting its decision that Claimant failed to meet his burden of proof. The first four factors support the conclusion that Claimant had successfully recovered from the injuries he sustained in the accident by December 28, 1998. The final factor mentioned by the Commission was that Claimant was thrown from his horse at his wedding. Claimant seizes upon this finding to support his argument that the Commission implicitly determined he sustained further injury to his back after December 28, 1998. Citing *Wright v. Sports Associated, Inc.,* 887 S.W.2d 596 (Mo. banc 1994), Claimant argues that the Commission substituted its own personal opinion on the question of medical causation for that of a qualified medical expert.[6] We disagree.

In the case at bar, Claimant took the position that he was permanently and totally disabled as a result of his work-related accident on September 29, 1997. In order for Employer to be liable for permanent total disability, Claimant bore the burden of proving "that his accident at work, *independent of other factors,* caused him to be permanently and totally disabled. He must not only show causation between the accident and injury, but also that a disability resulted and the extent of such disability." *Mathia v. Contract Freighters, Inc.,* 929 S.W.2d 271, 276 (Mo. App.1996) (italics added and citations omitted). Claimant's theory was that he sustained a herniated disc in the accident, which rendered him permanently and totally disabled. That theory was supported by the testimony of Drs. Coufal and Townsend.

■ Employer challenged that theory in a variety of ways. First, Employer introduced medical testimony from Drs. Crabtree and Arnold tending to prove that Claimant did not have a herniated disc or need further surgery at any time when he was examined and treated by them. Sec-

---

6. The holding in this case was that "[m]edical causation of a herniated disc of the spine cannot be considered uncomplicated. The commission may not substitute an administrative law judge's personal opinion on the question of medical causation of a herniated disc for the uncontradicted testimony of a qualified medical expert." *Wright,* 887 S.W.2d at 600.

ond, Employer introduced testimony from Dr. Woodward and several lay witnesses that Claimant was magnifying or exaggerating his injuries. Third, Employer sought to demonstrate that Claimant had engaged in another activity, unrelated to work, that could have caused the disc herniation he claimed to have. Employer presented substantial evidence from a number of lay witnesses that Claimant engaged in strenuous horseback riding on a number of occasions after his fusion surgery. Drs. Coufal and Woodward both testified that this activity could cause a herniated disc. Indeed, Dr. Coufal had not been informed about this aspect of Claimant's history, and the doctor acknowledged this information would have a bearing on his conclusion about causation. Moreover, Employer presented evidence that Claimant had twice sustained injuries by being thrown from his horse. Two witnesses saw Claimant being thrown from a horse at his wedding and exhibit obvious injuries at that time. Claimant also told Walter Beard about being thrown from a horse, and Claimant exhibited a bruise on his back from that fall. It was not Employer's obligation to disprove Claimant's case. *Decker v. Square D Co.*, 974 S.W.2d 667, 670 (Mo.App.1998). "In cases in which more than one event could have caused a condition but only one is compensable, a claimant has the burden of proving the nature and extent of disability attributable to his or her job duties or workplace." *Id.* Because Employer did not bear the burden of proof, it was entitled to show all possible causes for Claimant's condition. *Lands v. Boyster*, 417 S.W.2d 942, 946 (Mo.1967). "[A]n expert's view of possibility or probability is often helpful … and proper even though such assurance of possibility would not of itself be sufficient to make a submissible case for one having the burden of proof." *Id.*

In sum, we interpret the Commission's finding that Claimant was thrown from a horse at his wedding to simply be another factor casting doubt on his contention that the accident caused him to be totally and permanently disabled. It was appropriate for the Commission to consider this factor in deciding whether Claimant met his burden of proof. *Lands*, 417 S.W.2d at 946; *Decker*, 974 S.W.2d at 670. We reject Claimant's assertion that, by doing so, the Commission must have implicitly determined that Claimant sustained further injury to his back after December 28, 1998. Point I is denied.

In Claimant's second point, he contends the Commission erred in concluding that his complaints and medical treatment after December 28, 1998 were not caused by the accident. Claimant argues this ruling is not supported by substantial evidence and is against the weight of the evidence because: (1) Dr. Coufal found both a disc herniation and nerve root compression during his surgery; and (2) the medical evidence and lay testimony indicate that Claimant was a credible witness, had not sustained further injury and was permanently and totally disabled as a result of the accident. We disagree with both arguments.

■ First, Dr. Coufal's testimony was contradicted by the testimony of Drs. Crabtree, Woodward and Arnold, all of whom opined that the accident did not cause Claimant to sustain a disc herniation or nerve root compression. "[T]he credibility and weight of these competing expert opinions presented a question of fact for the Commission to decide." *Birdsong v. Waste Management*, 147 S.W.3d 132, 140 (Mo.App.2004). It is not the function of an appellate court to decide afresh what weight ought to be given to conflicting medical opinions on causation. *Sartor v. Medicap Pharmacy*, 181 S.W.3d 627, 630

(Mo.App.2006). Instead, we are bound by the Commission's determination of that issue. *Aldridge v. Southern Missouri Gas Co.*, 131 S.W.3d 876, 882 (Mo.App.2004). Since the Commission chose to rely upon the opinions of Drs. Crabtree, Woodward and Arnold to determine medical causation, we defer to that determination. *Birdsong*, 147 S.W.3d at 140–41; *Aldridge*, 131 S.W.3d at 882.

Similarly, we defer to the Commission on issues involving the credibility of lay witnesses. *Birdsong*, 147 S.W.3d at 137; *Pavia v. Smitty's Supermarket*, 118 S.W.3d 228, 234 (Mo.App.2003); *Chatmon v. St. Charles County Ambulance Dist.*, 55 S.W.3d 451, 455–56 (Mo.App.2001). The Commission obviously did not find Claimant to be credible with respect to his complaints about continuing symptoms after December 28, 1998. As of that date, Claimant had returned to work, lifted up to 100 pounds and resumed full-time work duties without restrictions. The record is replete with other examples of strenuous physical activities in which Claimant engaged after that time. It was within the Commission's discretion to disbelieve Claimant and to believe the physicians and lay witnesses presented by Employer. *Irving v. Missouri State Treasurer*, 35 S.W.3d 441, 446 (Mo.App.2000). Therefore, we defer to that credibility determination on appeal. *Johnson v. Denton Constr. Co.*, 911 S.W.2d 286, 288 (Mo. banc 1995).

The Commission's factual finding that Claimant sustained a permanent partial disability of 20% of the body as a whole as a result of his injuries from his September 1997 work accident is supported by competent and substantial evidence. In *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 223 (Mo. banc 2003), our Supreme Court was careful to point out that it would be the "rare case when the award is contrary to the overwhelming weight of the evidence." *Id.* at 223. After considering the whole record, we conclude this case does not fall within that category. Accordingly, Claimant's second point is denied.

The Commission's final award is affirmed.

SHRUM, Sr. J., and BARNEY, J., Concur.