

# In the
# Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| NICHOLAS LINTON, BY AND THROUGH HIS MOTHER AND NEXT FRIEND, ARICA LINTON, | ) ) ) | WD82637 |
| | ) | |
| Appellants, | ) | OPINION FILED: |
| | ) | November 10, 2020 |
| v. | ) | |
| | ) | |
| AMY S. CARTER, D.O. AND FERNS, MATILE, PERRYMAN & MOORE, ET AL., | ) ) ) | |
| | ) | |
| Respondents. | ) | |

**Appeal from the Circuit Court of Jackson County, Missouri**
The Honorable Bryan Round, Judge

Before Division Two:  Mark D. Pfeiffer, Presiding Judge, Alok Ahuja, Judge and
Gary D. Witt, Judge

Nicholas Linton[1] ("Nicholas") appeals from the judgment of the Circuit Court of

Jackson County ("trial court"), which following a jury trial found in favor of Respondents

Dr. Amy Carter, ("Dr. Carter"); Dr. Scott Gray, ("Dr. Gray"); Ferns, Matile, Perryman, and

Moore ("Ferns"); and Saint Luke's Hospital of Kansas City ("St. Luke's") (collectively

---

[1] Because Nicholas Linton and Arica Linton (collectively "Lintons") share a last name, we refer to the Lintons individually by their first names for purposes of clarity.  No familiarity or disrespect is intended.  Arica is Nicholas's mother, and Arica brought this action on Nicholas's behalf in her capacity as next friend.

"Respondents").  This appeal addresses the application of section 490.065.2 and evidentiary rules regarding the admissibility of expert witness testimony to different parties based upon which party bore the burden of proof on an issue.  The statutory requirements and evidentiary rules are the same for all parties, and the trial court's conclusion otherwise was an outcome determinative error in this case.  We reverse and remand for a new trial.

## Factual and Procedural Background[2]

On April 7, 2008, Arica Linton was 29.5 weeks pregnant with Nicholas and presented to St. Luke's in pre-term labor.  Dr. Carter[3] was the obstetrician/gynecologist on call at St. Luke's who treated Arica and Nicholas.  Dr. Carter attempted to stop Arica's labor and administered steroids to encourage Nicholas's lung development.  Dr. Carter also consulted with Dr. Gray, a Maternal Fetal Medicine Specialist who treats high risk obstetrical issues, who performed a growth ultrasound.  Dr. Gray concluded that Nicholas was in a breeched position and had a funic presentation.[4]  Dr. Gray recommended that Nicholas be delivered as soon as possible, and relying on that recommendation, Dr. Carter began to prepare for a Cesarean section.

St. Luke's has three procedure rooms available for Cesarean sections, and their practice is to leave one procedure room open for emergencies.  When Dr. Carter called Labor and Delivery, two of the rooms were being used for non-emergency Cesarean sections, and Dr. Carter could not use the third room unless she declared Arica and

---

[2] "The pertinent facts are viewed in the light most favorable to the jury's verdict."  *Hayes v. Price*, 313 S.W.3d 645, 648 (Mo. banc 2010).

[3] Dr. Carter practiced with Ferns, a professional corporation, and Dr. Carter was working within the scope and course of her employment at the relevant time period.

[4] In a funic presentation, the umbilical cord is between the fetus and the opening of the cervix.

Nicholas's situation an emergency. While waiting for a non-emergent procedure room, Arica's membranes containing amniotic fluid ruptured and compressed the umbilical cord, and at that point, Dr. Carter transferred her to a procedure room and performed an emergency Cesarean section. At the time of birth, Nicholas was "dusky" (bluish in color) with little respiratory effort and a weak cry. Nicholas was resuscitated and intubated. Nicholas was admitted to the neonatal intensive care unit ("NICU") with a diagnosis of prematurity and respiratory distress.

During the Caesarean section, Nicholas sustained a laceration to his upper thigh, which was treated by a subsequent surgery, and during this surgery, Nicholas experienced an episode of low blood pressure and difficulty breathing, which resulted in abnormally low blood gas readings. Approximately one year later, Nicholas was confirmed to have suffered a brain injury called Periventricular Leukomalacia ("PVL"), which caused spastic diplegia, which impacts his ability to move his lower and upper extremities.

On August 9, 2016, the Lintons filed an amended petition alleging that Respondents failed to: (1) timely and adequately examine, diagnose, and treat the Lintons, (2) timely deliver Nicholas, (3) timely perform a Cesarean section, (4) protect the baby from the umbilical cord compression, and (5) diagnose and treat fetal distress. A jury trial was held from October 29, 2018, through November 9, 2018.

The issue raised in this appeal is directed at the testimony of Dr. William Rhine ("Dr. Rhine") who testified as an expert on behalf of Respondents. Dr. Rhine is a neonatologist. Of significance, Dr. Rhine was the *only* neonatology expert witness who testified at trial.

3

The Lintons deposed Dr. Rhine on June 20, 2017, and Dr. Rhine's relevant deposition testimony was as follows:

> [Lintons' Counsel]: Do you have an opinion based upon a reasonable degree of medical certainty as to whether Nicholas Linton suffered [PVL] or injury to the white matter of his brain before birth?
>
> [Dr. Rhine]: No.
>
> Q. Do you have an opinion based upon a reasonable degree of medical certainty as to whether he suffered injury. Suffered [PVL] or injury to the white matter in his brain after the birth?
>
> A. No. I know it's one of the two. I know it's one of the two, either before or after or a combination.
>
> Q. Do you have an opinion that you can state to a reasonable degree of medical certainty whether it is before or after or a combination?
>
> A. Nope.

Based on this deposition testimony, the Lintons filed a motion *in limine* to preclude Dr. Rhine's "alternative causation" testimony on the grounds that his opinions were not stated to a reasonable degree of medical certainty.

The trial court held a pretrial hearing on all of the parties' various motions *in limine*. At the hearing, Respondents argued that Dr. Rhine's opinion would be that Nicholas's PVL injury was caused prenatal, post-natal or a combination of both but could not say to a reasonable degree of medical certainty which one was the actual cause. Respondents argued that an expert should be allowed to testify as to "alternate causes" of the injury without providing an opinion within a reasonable degree of medical certainty as to which one was the actual cause. Upon questioning by the trial court, the Respondents conceded

that they had no authority to support this argument. The trial court granted the Respondents additional time to brief the legal issue.

Respondents filed a trial brief arguing for the first time that because they did not bear the burden of proof on the issue of causation that their expert was not "governed by the same rule" as an expert of the party with the burden of proof on a particular issue.

Subsequently, on the morning of the first day of trial, the trial court conducted an additional hearing on the issue of Dr. Rhine's causation testimony. The Lintons made clear that they were not objecting to Dr. Rhine's testimony that to a reasonable degree of medical certainty it was his opinion that the events that happened from the time of the rupture of membranes of the umbilical cord until the time of birth were not the cause of Nicholas's PVL injury. The Lintons' objection was to the additional testimony from Dr. Rhine that the "alternative cause" of the PVL injury *may have been* caused by (1) other specific events which occurred prenatal, (2) that the cause *may have been* other specific events which occurred post-natal, or (3) that the cause *may have been* a combination of the two.

The trial court did not formally rule on the Lintons' motion *in limine* at the conclusion of the hearing other than stating on the record:

> All right, I think that is inappropriate to let it in. It's going to be subject of extensive cross examination, so I would caution- well, you make your objections as you need to make your objections, but I just want everybody to be aware that the plaintiff will be given great latitude in the cross examination they are allowed to do with Doctor Rhine before as we would expect.[5]

---

[5] It is unclear what the trial court meant by first indicating it would be "inappropriate to let it in" but then going on to indicate that the parties should make their objections and plaintiff would be granted wide latitude with the cross-examination of the expert. It appears that the trial court denied the motion *in limine* but indicated the issue would be addressed by objections to the testimony during the trial.

5

During the testimony of Dr. Rhine, the Lintons renewed their objection to Dr. Rhine's alternative causation testimony incorporating into the objection all of the previous arguments raised in their Motion *in limine*, and the trial court overruled the objection. Dr. Rhine was then allowed to testify, over objection, as to "what *could* be" the source of Nicholas's injuries. When asked about other possible sources of his injuries, Dr. Rhine stated, "So I wish I could tell you with certainty that I knew exactly where his white matter injury comes from, but I can't and I don't think anybody can." He then went on, over objection, to opine that he could not say with a reasonable degree of medical certainty the cause of the PVL injury to Nicholas's brain but *speculated* as to other *possible* causes. He stated that placental abnormalities were one source of the kind of injury at issue. Dr. Rhine testified that he could not say with a reasonable degree of medical certainty that an episode of low blood pressure during the subsequent surgery on his leg caused the PVL injury in Nicholas – but low blood pressure is *associated with the possibility* of an increased risk of a PVL injury and the longer the low blood pressure lasted the more worrisome. He discussed the importance of Nicholas having a low carbon dioxide reading because this was a known risk factor for a PVL injury. Dr. Rhine testified: "[G]eneral anesthesia has an impact on term babies, [it] *may* on preterm babies. Can I say that that one factor, no, but I know that's an unusual thing that happened in his course that would put him at an increased risk." (emphasis added).

In closing argument, the Respondents focused almost exclusively on the issue of causation and emphasized that Dr. Rhine was the only neonatologist who had testified for

6

any party in the case and focused the jury on his testimony regarding "alternative possible causes" of the PVL injury.

The jury returned a verdict in favor of the Respondents and the trial court entered Judgment accordingly. This timely appeal followed.

**Standard of Review**

Expert witness testimony is inadmissible if the offering party fails to satisfy the statute's foundational requirements. *Scott v. Blue Springs Ford Sales, Inc.,* 215 S.W.3d 145, 173 (Mo. App. W.D. 2006) (overruled on other grounds by *Badahman v. Catering St. Louis,* 395 S.W.3d 29, 40 (Mo. banc 2013)). The question of whether the foundational requirements of the statute have been met is a legal issue that we review *de novo*. *Id.* Once it is determined that the foundational requirements have been met, it is still within the trial court's discretion to admit or deny the admission of the expert's opinions. *Id.* "This Court reviews a circuit court's decision to admit or exclude expert testimony for an abuse of discretion." *Spalding v. Stewart Title Guar. Co.*, 463 S.W.3d 770, 778 (Mo. banc 2015). "A circuit court abuses its discretion when its 'ruling is clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration.'" *Shallow v. Follwell*, 554 S.W.3d 878, 881 (Mo. banc 2018) (quoting *Lozano v. BNSF Ry. Co.*, 421 S.W.3d 448, 451 (Mo. banc 2014)). We will "not reverse a circuit court's judgment unless the error materially affected the merits of the action." *Id*.

7

**Discussion**

In his sole point relied on, Nicholas alleges that the trial court erred in admitting Dr. Rhine's alternative causation testimony because Dr. Rhine's testimony was not given to a reasonable degree of medical certainty in that Dr. Rhine was allowed to inform the jury of *possible* causes of Nicholas's brain injury thereby causing a substantial prejudice to the Lintons and leading to improper evidence in support of the verdict for Respondents.

The admission of expert testimony is governed by section 490.065. *McGuire v. Seltsam*, 138 S.W.3d 718, 720 (Mo. banc 2004). Section 490.065.2[6] provides:

> (1) A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) The testimony is based on sufficient facts or data;
>
> (c) The testimony is the product of reliable principles and methods; and
>
> (d) The expert has reliably applied the principles and methods to the facts of the case[.]

"Failure to satisfy [the statute's] foundation requirements renders proffered expert witness testimony inadmissible." *Scott*, 215 S.W.3d at 173.

When expert testimony concerns medical issues, "[e]xpert witnesses must provide testimony within a reasonable degree of medical certainty to support causation." *Payne v.*

---

[6] All statutory references are to the Revised Statutes of Missouri (2016) as currently updated unless otherwise noted.

Section 490.065.2 was amended effective August 28, 2017 and models the Federal Rules of Evidence, Rules 702 through 705. *Jones v. City of Kan. City,* 569 S.W.3d 42, 53 (Mo. App. W.D. 2019) (overruled on other grounds by *Wilson v. City of Kan. City*, 598 S.W.3d 888 (Mo. banc 2020)).

8

*Fiesta Corp*., 543 S.W.3d 109, 119 (Mo. App. E.D. 2018) (citing *Edgerton v. Morrison*, 280 S.W.3d 62, 69 (Mo. banc 2009)). The standard is necessary because "where there is a sophisticated injury, requiring surgical intervention or other highly scientific technique for diagnosis, proof of causation is not within a lay person's understanding." *Love v. Waring*, 560 S.W.3d 614, 619 (Mo. App. W.D. 2018) (internal quotation omitted). Expert testimony which does not indicate that the expressed opinion is within a reasonable degree of medical certainty is legally irrelevant because it necessarily lacks sufficient facts or data to reach a reliable conclusion. *Wagner v. Piehler*, 879 S.W.2d 789, 792 (Mo. App. W.D. 1994). Admitting this evidence is likely to mislead the jury or confuse the issues. *See Glaize Creek Sewer Dist. Of Jefferson Cty. v. Gorham*, 335 S.W.3d 590, 595 (Mo. App. E.D. 2011) (holding that admission of expert testimony not stated to a reasonable degree of certainty was devoid of evidentiary value and misled the jury); *see also Adkins v. Hontz*, 337 S.W.3d 711, 720 (Mo. App. W.D. 2011) (abrogated on other grounds) (finding that expert witness did not base her opinions on the type of data reasonably relied upon by experts in her field and admitting her opinion had potential to confuse or mislead the jury). "When an expert merely testifies that a given action or failure to act 'might' or 'could have' yielded a given result, though other causes are possible, such testimony is devoid of evidentiary value." *Tompkins v. Cervantes,* 917 S.W.2d 186, 189 (Mo. App. E.D. 1996) (citing *Bertram v. Wunning*, 385 S.W.2d 803, 807 (Mo. App. E.D. 1965); *Shackelford v. W. Cent. Elec. Co-op, Inc.,* 674 S.W.2d 58, 62-63 (Mo. App. W.D. 1984); *Hunt v. Armour & Co.,* 136 S.W.2d 312, 315-16 (Mo. 1939)). While the exact phraseology of "reasonable degree of certainty" may not be necessary, "language that is equivocal will not rise to the

9

level necessary for consideration of the evidence by the trier of fact." *Thompson v. Brown & Williamson Tobacco Corp.,* 207 S.W.3d 76, 109 (Mo. App. W.D. 2006)(internal citations omitted).

Respondents contend that because the Lintons had the burden of proof to establish causation the Lintons alone had to present expert testimony within a reasonable degree of medical certainty as to that issue, but that Respondents were not bound by the statute or the same rules of evidence regarding the admissibility for expert witness testimony in their defense. Respondents point out that every case cited by the Lintons in regard to the foundational requirements for expert testimony were focused on the expert testimony of the party with the burden of proof on the given issue. However, Respondents fail to point to a single case which has held that the statute or the rules of evidence are to be applied differently based on which party bears the burden of proof. That is because, quite simply, they do not.

The rules of evidence are applicable to *all* parties in a civil action regardless of the parties' burden of proof on a given issue. Nothing in section 490.065 draws any distinction or sets forth a different standard for the admissibility of expert testimony based on the applicable burden of proof. Dr. Rhine clearly stated in his deposition that he did *not* have an opinion based upon a reasonable degree of medical certainty as to the cause of or when Nicholas suffered the PVL injury. At trial, Dr. Rhine testified before the jury, "So I wish I could tell you with certainty that I knew exactly where his white matter injury comes from, but I can't and I don't think anybody can." He then went on, over objection, to opine that he could not say with a reasonable degree of medical certainty the cause of the PVL

10

injury to Nicholas's brain but speculated as to other *possible* causes. Therefore, this causation testimony violated the statute, lacked foundation, and the testimony was therefore irrelevant, inadmissible, confused the jury, and the trial court erred as a matter of law in allowing Dr. Rhine's opinions regarding "alternate causes" of the injury into evidence.

The dissent asserts that we are bound by *Lands v. Boyster*, 417 S.W.2d 942, 944 (Mo. 1967), where a pregnant passenger went into premature labor following a car accident, and her child died several hours after its premature delivery. Diss. Op. at 5-8. During a trial for negligence, the driver asserted that the premature delivery resulting in the child's death may have been caused by the mother's pre-existing hypo-pituitary condition. *Lands*, 417 at 944. Our Supreme Court held that:

> It was not improper, therefore, for [the driver] to ask his expert witness if a condition, assumed from other evidence, *might, could or would produce a certain result*, because an expert's view of possibility or probability is often helpful to the jury and proper even though such assurance of possibility would not of itself be sufficient to make a submissible case for one having the burden of proof.

*Id*. at 946. (emphasis added). However, *Lands* is readily distinguishable from the instant case because it significantly predates the legislature's adoption of 490.065 governing the standards for the admission of expert testimony. In addition, *Lands* sounded in general negligence rather than medical negligence, which are two separate and distinct causes of action. *See Brown v. Bailey*, 210 S.W.3d 397, 404 (Mo. App. E.D. 2006) ("A plaintiff can pursue a negligence cause of action against a defendant-physician in two ways: (1) a claim based on medical negligence, also referred to as 'medical malpractice,' and/or (2) a claim

11

based on general negligence."). Furthermore, cases of general negligence and medical negligence have different definitions in the model jury instructions. In cases of medical negligence, the term "negligence" is defined as "the failure to use that degree of skill and learning ordinarily used under the same or similar circumstances by the members of defendant's profession." M.A.I. 11.06. In cases of general negligence, the term "negligence" is defined as "the failure to use that degree of care that an ordinarily careful person would use under the same or similar circumstances." M.A.I. 11.05. For these reasons, we are not bound by *Lands*.[7]

"Where an expert's testimony is mere conjecture and speculation, it does not constitute substantive, probative evidence on which a jury could find ultimate facts and liability." *Mueller v. Bauer*, 54 S.W.3d 652, 657 (Mo. App. E.D. 2001). In *Mueller*, a medical expert in a medical malpractice lawsuit "testified in his deposition that he felt that a patient died because his heart stopped beating due to profound bradycardia, [but the expert] did not have the requisite degree of certainty about the cause of death because he admitted that he could not say with reasonable probability what caused patient's death[.]" *Id*. at 655. The expert further testified that there were three potential causes of death, and "it would be speculative to assign either cause of death in this case." *Id.* The Eastern District of this Court concluded that "[w]hen a party relies on expert testimony to provide evidence of causation when there are two or more possible causes, that testimony must be

---

[7] Similarly, the dissent relies on *Roberts v. Missouri Highway and Transportation Commission*, 222 S.W.3d 222 (Mo. App. S.D. 2007), which applied the holding in *Lands* to a worker's compensation claim that arose from a traffic accident. Diss. Op. at 7. *Roberts* is also distinguishable because it is not a medical negligence case.

12

given to a reasonable degree of medical certainty." *Id.* at 657. (citing *Baker v. Guzon*, 950 S.W.2d 635, 646 (Mo. App. E.D. 1997)).

The dissent further relies on *Wilder v. Eberhart*, 977 F.2d 673, 676 (1st Cir. 1992), where the court applying New Hampshire law held that "a defendant may produce other 'possible' causes of the plaintiff's injury. These other possible causes need not be proved with certainty or more probably than not." Diss. Op. at 10-11. However, *Wilder* is not binding on this Court, and is in contravention to the Eastern District of this Court's holding in *Mueller*. We do not find *Wilder* persuasive because it establishes two different standards for a single rule of evidence—one for plaintiffs and one for defendants.[8] The rules of evidence must apply equally to all parties in a suit, to hold otherwise would violate the bedrock principles of fundamental fairness in our judicial system. Therefore, the circuit court erred in admitting Dr. Rhine's testimony because his opinions were not provided within a degree of medical certainty as required by our rules of evidence, and in doing so gave an unfair advantage to the Respondents.

However, the improper admission of expert testimony does not end our analysis. The error must also be prejudicial. *See Shallow*, 554 S.W.3d at 881 (holding that erroneous admission of expert testimony will not be reversed "unless the error materially affected the merits of the action."). "A determination of prejudice by the erroneous admission of evidence depends largely upon the facts and circumstances of the particular case." *McGuire*, 138 S.W.3d at 722. "The appropriate question is whether the erroneously

---

[8] The dissent also relies on a string of cases that relied on the rationale set forth in *Wilder*, and we similarly do not find them persuasive. Diss. Op. at 11-12.

13

admitted evidence had any reasonable tendency to influence the verdict of the jury." *Id.* (citing *Chester v. Shockley*, 304 S.W.2d 831, 835 (Mo. 1957)).

In the instant case, the Lintons alleged and produced evidence that Nicholas suffered a hypoxic-ischemic event causing permanent injury to his brain at or near the time of his birth as a result of Respondents negligence. The Respondents rebutted this evidence largely through the testimony of Dr. Rhine. Dr. Rhine testified that various factors "associated with the *possibility* of an increased risk" (emphasis added) and "timeframes when a baby goes through the physiological abnormalities that it *could have* this injury." (emphasis added). Further, when Dr. Rhine was asked "What are the other sources [of] this injury in Nicholas Linton?," Dr. Rhine testified:

> So I wish I could tell you with certainty that I knew exactly where this white matter injury comes from, but I can't and I don't think anybody can. We have learned more over the years about this [problem] but there are still some questions that are unanswered.

After stating that the causes of the PVL injury in Nicholas were unknown, Dr. Rhine was allowed to continue by identifying *possible causes* including placental abnormalities during gestation, low blood pressure, general anesthetic, and "periods where the carbon dioxide level is actually below a bit." Dr. Rhine also opined that Nicholas *could have* sustained PVL during Nicholas's post-natal surgery. Because Dr. Rhine's opinions were not stated to a reasonable degree of medical certainty, they were irrelevant and speculative and therefore were of no value to the jury charged with finding ultimate facts and determining liability. For the same reason that expert testimony is allowed into evidence, because it assists the lay juror in understanding difficult scientific or medical concepts that

14

a juror probably will not understand absent this testimony, when expert testimony is improperly admitted it is more likely to result in prejudice because it tends to mislead the jurors regarding difficult scientific or medical concepts. We conclude such prejudice exists here.

Furthermore, Respondents highlighted and focused on Dr. Rhine's testimony during closing arguments pointing to the fact he was the sole neonatologist to testify during the trial and argued the jury should rely on his testimony during their deliberations exacerbating the prejudice of the improperly admitted evidence. Other defense experts testified as to contradictory causes of Nicholas's injury. Dr. Marvin Nelson opined that Nicholas's injury was not caused by hypoxia but was instead caused by an abnormal placenta during the pregnancy. Dr. Michael Ross, while stating that his testimony was limited to the standard of care rather than causation, opined that the PVL injury was caused by inflammation and extreme prematurity. Dr. Paul Levisohn attributed Nicholas's injury to a placental abnormality or a maternal infection, but he acknowledged he had no basis for interpreting placental pathology. Dr. David Swartz opined that the placenta did not provide adequate oxygen during gestation and this was the cause rather than the compression of the umbilical cord at the time of birth. Respondents sought to mitigate this conflicting testimony through Dr. Rhine's testimony that no one would be capable of identifying the cause of Nicholas's PVL injury but testified, without referring to other expert's testimony, that all of the aforementioned causes were possible causes of Nicholas's PVL injury. Further, Dr. Rhine was allowed to opine that the PVL injury *could have also* occurred during Nicholas's post-natal surgery. Because all of the defense experts opined

15

that the injury would have occurred before birth (placental abnormality, maternal infection, in utero inflammation), Dr. Rhine's testimony that Nicholas's injury *could have* occurred before birth, after birth, or from a combination of the two was the only testimony that addressed Dr. Rhine's conflicting and inadmissible opinions as to causation, particularly the post-birth surgery as a potential cause.

Because Dr. Rhine's testimony regarding alternative causation was not stated within a reasonable degree of medical certainty, the trial court erred in admitting it into evidence. Because Dr. Rhine's testimony was central to the Respondent's negation of the causation element and extensively highlighted by the Respondents during closing arguments as the only neonatologist placing his opinions on a pedestal, it materially affected the outcome of the trial resulting in prejudice.[9]

**Conclusion**

We reverse and remand for a new trial.

_____
Gary D. Witt, Judge

Ahuja, Judge, dissents in separate opinion
Pfeiffer, Presiding Judge, joins in the majority opinion

---

[9] The Respondents also argue, for the first time on appeal that because the jury found that Respondents were not negligent through a converse jury instruction, that the Lintons did not meet their burden of proof even if Dr. Rhine's testimony was not considered by the jury. Respondents argue that the Lintons bore the burden of proof to establish that: "(1) an act or omission of [Respondents] failed to meet the requisite medical standard of care; (2) the act or omission was performed negligently; and (3) the act or omission caused the plaintiff's injury." *Edgerton*, 280 S.W.3d at 68. However, the jury instructions and verdict directors were not included in the Appellant's Legal File. Rule 81.12(e) provides that "[i]f a respondent is dissatisfied with appellant's record on appeal, that respondent may file without leave of court within the time allowed for filing respondent's brief such additional parts of the record on appeal as respondent considers necessary." We presume that omitted portions of the record are unfavorable to the party who relies on the omitted record. *See State v. Richter*, 504 S.W.3d 205, 208 n. 3 (Mo. App. W.D. 2016). Therefore, because this argument was never presented to the trial court and because we were not provided the necessary documents in the record on appeal to properly review this issue, we decline to further address this argument.

16



# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

NICHOLAS LINTON, by and )
through his Mother and Next )
Friend, ARICA LINTON, )
             Appellants, )
                )
v.                     )   WD82637
                )
AMY S. CARTER, D.O., and )  FILED: November 10, 2020
FERNS, MATILE, PERRYMAN & )
MOORE, et al., )
            Respondents. )

### DISSENTING OPINION

The majority reverses a judgment entered after a two-week jury trial, based on its conclusion that part of the testimony of one of the Respondents' seven expert witnesses was speculative, and therefore improperly admitted.

I respectfully dissent. Dr. William Rhine testified, to a reasonable degree of medical certainty, that Nicholas Linton's brain injury was caused by specific circumstances which Dr. Rhine identified, acting alone or in combination. This testimony was not "mere conjecture and speculation," as the majority contends. Maj. Op. at 12. The Lintons' counsel acknowledged at argument that it was permissible for a defense expert to testify to multiple potential causes of a plaintiff's injury, so long as the expert testified to a reasonable degree of medical certainty that those factors, in some combination, caused the injury. Dr. Rhine did just that.

Numerous Missouri cases, including at least two decisions of the Missouri Supreme Court which we are bound to follow, have endorsed similar "possible

cause" testimony – whether presented by a plaintiff _or_ by a defendant. Caselaw from other jurisdictions likewise authorizes testimony like Dr. Rhine's, to rebut a medical-malpractice plaintiff's causation evidence. The majority opinion would apparently be the first, and only, appellate decision in the United States to reverse a jury verdict based on the admission of defense expert testimony like Dr. Rhine's.

Even if the admission of Dr. Rhine's alternative-cause testimony was erroneous, it would not justify reversal. The Linton's object to only a small portion of Dr. Rhine's testimony – and he was just one of five defense experts testifying to the causation of Nicholas' brain injury. Another defense expert offered virtually identical alternative-causation testimony, to which the Lintons did not object. Despite the majority's characterizations, Dr. Rhine's challenged testimony was not "central to," or "extensively highlighted by," the Respondents' closing arguments – to the contrary, it was barely mentioned in the Respondents' lengthy closings.

**I.**

The Lintons do not challenge the bulk of Dr. Rhine's testimony. The main purpose of his testimony was to dispute the Lintons' theory that Nicholas' brain injury was caused by oxygen-deprivation (hypoxia) resulting from compression of the umbilical cord during the eighteen minutes between when the amniotic sac ruptured, and Nicholas' delivery by Caesarean section. At the outset of his testimony, counsel requested that Dr. Rhine "confine [his] opinions to those that will be expressed with a reasonable medical certainty," and he agreed to do so. Tr. 1385:1-5.

Dr. Rhine testified in detail as to why he rejected the Lintons' causation theory. Thus, he testified that Nicholas' "dusky" (or blue) skin color at birth, and his limited respiratory effort, were _not_ signs that he had experienced a brain injury during delivery. Instead, Dr. Rhine explained that Nicholas' early breathing difficulties and appearance were typical of a newborn in his circumstances, who:

2

was significantly premature; was not given a full course of steroids prior to birth to accelerate his lung development; and whose mother was given general anesthesia and magnesium. Tr. 1390:16-1391:17. The fact that Nicholas' breathing recovered reasonably quickly after he was born also indicated to Dr. Rhine that Nicholas had not suffered a serious, recent brain injury. Tr. 1391:19-1392:9. Dr. Rhine found confirmation that Nicholas had _not_ suffered "a recent profound insult that has left him with permanent brain damage" in the admission note from the neonatal intensive care unit, which indicated that he was "responsive and he has normal tone and activity for this gestation"; Dr. Rhine testified that babies who have just suffered significant brain injury "take[ ] days . . . to look normal," and that some "never fully recover." Tr. 1396:16-21, 1397:12-13.

Although the Lintons' experts believed that Nicholas' Apgar scores were significant indicators of a birth-related brain injury, Dr. Rhine testified that Apgar scores assigned shortly after birth do not identify long-term disability. Tr. 1403:8-13. In any event, he opined that Nicholas' scores were "fairly typical, especially under the circumstances of an emergent C-Section and mom getting magnesium." Tr. 1403:18-20.

Dr. Rhine testified that, while some of Nicholas' first post-birth blood-gas results were "concerning" and "notable," they were not problematic given that he was moving and responsive, and given that the readings improved an hour later. Tr. 1412:16-1413:7, 1415:8-11. If Nicholas had suffered "a profound insult in the minutes before birth, an intrapartum asphyxial event," his blood gasses would have taken several hours, or longer, to return to a normal range. Tr. 1416:3-9. Dr. Rhine considered the progression of blood gas results to be "one more strong piece of evidence that he did not have significant compromise i[n] that short time before birth that would be associated with brain injury." Tr. 1417:16-21.

3

Dr. Rhine also found it significant that, although Nicholas was under close observation in the neonatal intensive care unit for more than six weeks, no health professional expressed a concern in Nicholas' chart that he had suffered an injury associated with hypoxia during childbirth, and no MRI of Nicholas' head was ordered. Tr. 1418:20-1419:9, 1420:16-1421:3.

After explaining why he rejected the Lintons' causation theory, Dr. Rhine was asked to discuss "other more likely causes of Nicholas' injury." Tr. 1421:20-24. Counsel reminded Dr. Rhine to confine his opinions to those he could express "to a reasonable degree of medical certainty." Tr. 1422:1-3. Dr. Rhine began his discussion of alternate causes by emphasizing that neither he, nor anyone else, could identify with certainty the precise cause of Nicholas' injury:

> So I wish I could tell you with certainty that I knew exactly where his white matter injury comes from, but I can't and I don't think anybody can. We have learned more over the years about this proble[m], but there are still some questions that are unanswered.

Tr. 1422:7-12.

Dr. Rhine then proceeded to discuss several potential sources of Nicholas' brain injury which were supported in the evidence, including Nicholas' significant prematurity, placental abnormalities, and episodes of low blood pressure and low carbon dioxide in the blood during the first few days of his life. Tr. 1386:24-1387:8, 1424:12-25, 1427:12-15.

Dr. Rhine closed his direct testimony by opining, to a reasonable degree of medical certainty, that one or more of the alternative causes he had identified in fact caused Nicholas' brain injury, and that his brain injury had _not_ been caused by hypoxia after the amniotic sac ruptured, as the Lintons contended.

> Q. So you said something earlier that I want to amplify in the context of all of the causes that we've identified here. Are you able to say that any one of these causes was the cause of Nicholas' white matter injury of brain injury?

4

A. No.

Q. What can you say with reasonable medical certainty?

A. I can say one or more of these, I think to a reasonable medical certainty, was the cause. . . .

Q. So with reasonable medical certainty, you are able to say that it's one or more, i.e. a combination of the factors that we have just talked about, both before the birth and those factors that we have just looked at after the birth?

A. Yes.

Q. Okay, and once again, your opinion with reasonable medical certainty about whether this injury occurred during the birthing process is what?

A. I think that is not when it happened for all of these reasons that I explained.

Tr. 1435:8-1436:12.

Dr. Rhine did not simply "speculate[ ] as to other *possible* causes" of Nicholas' injuries, as the majority suggests. Maj. Op. at 11. To the contrary, Dr. Rhine used his medical knowledge and expertise to opine, to a reasonable degree of medical certainty, that one or more of the causes he identified had actually caused Nicholas' injuries.

## II.

A large body of caselaw, both from Missouri and elsewhere, supports the circuit court's admission of Dr. Rhine's alternative-causation testimony.

## A.

Most significantly, the Missouri Supreme Court has expressly held that testimony identifying "possible [alternative] causes" of bodily injuries, like Dr. Rhine's testimony, is proper and admissible.

In *Lands v. Boyster*, 417 S.W.2d 942 (Mo. 1967), a pregnant woman went into premature labor following a car accident. Her child "died several hours after its premature delivery." *Id.* at 944. The woman sought to recover damages for her child's death from the driver of the other vehicle involved in the accident. In

5

response, the other driver presented evidence that the child's premature delivery and death could have been caused by the mother's pre-existing medical condition, rather than by the car accident. The Supreme Court held that this evidence of an alternate cause was permissible, even though framed in terms of "possibilities".

> Defendant had no burden to disprove plaintiffs' case, but was entitled to show all possible causes of Mrs. Lands's condition. ***It was not improper, therefore, for defendant to ask his expert witness if a condition, assumed from other evidence, might, could, or would produce a certain result***, because an expert's view of possibility or probability is often helpful to the jury and proper even though such assurance of possibility would not of itself be sufficient to make a submissible case for one having the burden of proof.

*Id.* at 946 (emphasis added).

Although decided more than 50 years ago, *Lands* has not been overruled, and we are bound to follow it under Article V, § 2 of the Missouri Constitution, which specifies that the decisions of the Missouri Supreme Court "shall be controlling in all other courts."

The admissibility of such possible-cause testimony is not a "defendants-only" evidentiary principle, as the majority suggests. To the contrary, *Lands* relied on the Supreme Court's earlier decision in *Kimmie v. Terminal Railroad Association of St. Louis*, 66 S.W.2d 561 (Mo. 1933), which expressly held that a personal-injury <u>plaintiff</u> would be entitled to present similar testimony. In *Kimmie*, the Court held that a plaintiff/railroad employee had failed to present sufficient evidence that a work-related fall had caused a cancerous bone tumor, where his expert witnesses merely testified that the fall "might, could or would" have caused the tumor. *Id.* at 603. But the Court emphasized that personal-injury plaintiffs were entitled to present such possible-cause evidence, so long as <u>other</u> evidence placed causal responsibility on the defendant.

> We do not hold, however, as defendant contends, that it is improper to ask an expert witness if something might, could, or would

6

produce a certain result. ***An expert's view of possibility or probability is often helpful and proper. Where there are other facts which tend to show an accident caused a certain condition, the assurance of an expert that it is scientifically possible is of some aid to the jury in determining what are reasonable inferences to be drawn from such facts.*** Assurance of possibility is not of itself, however, sufficient to make a submissible case, upon the issue of cause and effect, for a plaintiff who has the burden of proof upon that issue. The trouble here is that there is no more than possibility shown by either the facts or the expert testimony.

*Id.* at 605 (emphasis added).

Consistent with *Kimmie*, the Lintons could have presented testimony like Dr. Rhine's, to show that there are several medically-recognized, possible causes of periventricular leukomalacia. As *Kimmie* explains, however, while the Lintons may have been entitled to present such evidence, it would not have been sufficient, standing alone, to sustain a verdict in their favor.

The principles announced in *Lands* and *Kimmie* have been applied in numerous more recent Missouri decisions. Thus, the Southern District followed *Lands* in *Roberts v. Missouri Highway & Transportation Commission*, 222 S.W.3d 322 (Mo. App. S.D. 2007), in which a worker's compensation claimant contended that he had sustained a herniated disc in his back as a result of work-related traffic accident. The employer defended the claim, in part, by presenting evidence of the claimant's falls while horseback riding after the traffic accident; the employer also presented expert testimony "that this activity *could cause* a herniated disc." *Id.* at 333 (emphasis added). The Commission's order denying compensation referred to claimant's falls while horseback riding to support its conclusion that claimant had failed to prove that his injuries were work-related. The Southern District affirmed. Citing *Lands*, it explained:

It was not Employer's obligation to disprove Claimant's case. "In cases in which more than one event could have caused a condition but only one is compensable, a claimant has the burden of proving the nature

7

and extent of disability attributable to his or her job duties or workplace." ***Because Employer did not bear the burden of proof, it was entitled to show all possible causes for Claimant's condition***. *Lands v. Boyster*, 417 S.W.2d 942, 946 (Mo. 1967). "[A]n expert's view of possibility or probability is often helpful . . . and proper even though such assurance of possibility would not of itself be sufficient to make a submissible case for one having the burden of proof." *Id.*

In sum, ***we interpret the Commission's finding that Claimant was thrown from a horse at his wedding to simply be another factor casting doubt on his contention that the accident caused him to be totally and permanently disabled. It was appropriate for the Commission to consider this factor in deciding whether Claimant met his burden of proof.*** *Lands*, 417 S.W.2d at 946. We reject Claimant's assertion that, by doing so, the Commission must have implicitly determined that Claimant sustained further injury to his back after [the work-related traffic accident on] December 28, 1998.

*Id.* at 333 (emphasis added; other citations omitted).

In *Koontz v. Ferber*, 870 S.W.2d 885 (Mo. App. W.D. 1993), this Court upheld the admission of alternate-causation evidence in a case involving a similar claim of birth-related injury. In *Koontz*, following a defense verdict, the plaintiff claimed that the circuit court had erroneously permitted the defendants to offer the testimony of three physicians "regarding the possible causes of [the child's] injuries other than perinatal trauma," because "the three physicians were unable to offer testimony to a reasonable degree of medical certainty as to what caused the child's injuries." *Id.* at 892. The Court summarily rejected this argument, in reasoning that would seem equally applicable here:

Plaintiffs complain that the doctors did not base their testimony on a reasonable degree of medical certainty. This claim is without merit. Each physician specifically opined to a reasonable degree of medical certainty that Amber's injuries did not result from a hypoxic injury but rather resulted from either a primary muscle disease or a developmental malformation of the brain occurring at or before the 34th week of gestation. Next, plaintiffs complain that the doctors' opinions primarily addressed what was *not* the cause of Amber's condition, rather than exactly what *was* the cause. Plaintiffs, however, fail to demonstrate any error. We fail to discern any legal or logical

8

> problem with such testimony. It is certainly proper for a defense
> expert to state an opinion as to whether plaintiffs' theory is a theory
> held by other medical experts.

*Id.* at 892-93.

In *Heiskell v. Golden City Foundry, Inc.*, 260 S.W.3d 443 (Mo. App. S.D. 2008), the Southern District affirmed a decision of the Labor and Industrial Relations Commission which denied worker's compensation benefits for an employee's death caused by a pulmonary embolism. In finding that the claimant had failed to prove that his injuries were work-related, the Commission relied on the testimony of an employer's expert which was much like Dr. Rhine's.

> Dr. Boulware testified there was no way of knowing exactly what
> caused the pulmonary embolism which killed Employee, but that based
> on the numerous risk factors [(including smoking, diabetes, and
> obesity)] it could have been any number of things which were
> supported by the medical evidence.

*Id.* at 451. The Commission expressly relied on Dr. Boulware's causation testimony, stating that he was "'refreshingly candid when he opines that the exact cause of the death of [Employee] cannot be determined within a reasonable degree of medical certitude.'" *Id.* The Southern District held that the Commission, as fact-finder, was entitled to rely on Dr. Boulware's alternative-possible-cause testimony to reject the claimant's evidence that the employee's death was work-related. *Id.* While the Court did not specifically address the admissibility of the alternative-causation testimony, it plainly considered that testimony to be competent and substantial evidence supporting the Commission's denial of the benefits claim.

Similarly, numerous cases have applied the *Kimmie* decision, and held that a plaintiff too can present evidence of potential causes of an injury – although to sustain a verdict, the plaintiff must _also_ present some "other facts" supporting a specific cause for which the defendant is liable. *See, e.g.*, *Stephens v. Guffey*, 409 S.W.2d 62, 69-70 (Mo. 1966); *Ketcham v. Thomas*, 283 S.W.2d 642, 649-50 (Mo. 1955); *Baker v. Kansas City Terminal Ry. Co.*, 250 S.W.2d 999, 1007 (Mo. 1952);

*Kummer v. Cruz*, 752 S.W.2d 801, 806-07 (Mo. App. E.D. 1988); *York v. Daniels*, 259 S.W.2d 109, 122-23 (Mo. App. 1953).

**B.**

The principle that litigants in a personal-injury case may present evidence of multiple, potential causes of an injury is not limited to Missouri. On the contrary, decisions from other state and federal courts endorse such testimony with near uniformity. Like *Lands*, many of these out-of-state cases emphasize that the justification for permitting alternative-possible-cause evidence is particularly strong when it is *the defendant* proffering the evidence, because the defendant has no burden to actually <u>prove</u> the cause of a plaintiff's injuries, but need only *cast doubt* on the plaintiff's evidence. Notably, Dr. Rhine's testimony is significantly *stronger* than the testimony endorsed in many of the out-of-state cases, since he testified to a reasonable degree of medical certainty that the alternate causes he had identified <u>did</u> (alone or in combination) produce Nicholas' injury.

A leading decision is *Wilder v. Eberhart*, 977 F.2d 673 (1st Cir. 1992) (New Hampshire law). In *Wilder*, like here, a physician-defendant in a medical malpractice case sought to introduce evidence of potential causes of the plaintiff's injuries other than the physician's negligence. The trial court excluded the alternative-cause evidence. Following a plaintiff's verdict, the physician appealed, arguing that the district court had erroneously excluded his alternative-causation evidence.

The First Circuit agreed, and reversed. It explained:

> It is well settled under New Hampshire law that the burden of proof with respect to causation in a medical malpractice case rests and remains with the plaintiff. . . . On the other hand**, *the defendant need not disprove causation*.** Rather, he must produce credible evidence which tends to discredit or rebut the plaintiff's evidence. . . . ***Defendant need not prove another cause, he only has to convince the trier of fact that the alleged negligence was not the legal cause of the injury. In proving such a case, a defendant***

10

***may produce other "possible" causes of the plaintiff's injury.
These other possible causes need not be proved with certainty or
more probably than not***. To fashion such a rule would unduly tie a
defendant's hands in rebutting a plaintiff's case, where as here,
plaintiff's expert testifies that no other cause could have caused
plaintiff's injury. The burden would then shift and defendant would
then bear the burden of positively proving that another specific cause,
not the negligence established by plaintiff's expert, caused the injury.
Certainly, this is much more than what should be required of a
defendant in rebutting a plaintiff's evidence.

> Were we to accept plaintiff's argument that once a plaintiff puts
on a prima facie case, a defendant cannot rebut it without proving
another cause, the resulting inequities would abound. For example if
ninety-nine out of one hundred medical experts agreed that there were
four equally possible causes of a certain injury, A, B, C and D, and
plaintiff produces the one expert who conclusively states that A was
the certain cause of his injury, defendant would be precluded from
presenting the testimony of any of the other ninety-nine experts,
unless they would testify conclusively that B, C, or D was the cause of
injury. Even if all of defendant's experts were prepared to testify that
any of the possible causes A, B, C or D, could have equally caused
plaintiff's injury, so long as none would be prepared to state that one
particular cause, other than that professed by plaintiff more probably
than not caused plaintiff's injury, then defendant's experts would not
be able to testify at all as to causation. We think that such a result . . .
would be manifestly unjust and unduly burdensome on defendants.

*Id.* at 676-77 (emphasis added; citations and internal quotation remarks omitted).

*Wilder* was followed in ***R.J. Reynolds Tobacco Co. v. Mack***, 92 So.3d 244 (Fla.

App. 2012), in which a plaintiff contended that her decedent's laryngeal cancer had

been caused by cigarette smoking. In response, the defendant sought to offer

testimony of a physician-expert that, because the decedent had quit smoking

sixteen years before his cancer diagnosis, "the decedent's risk of getting cancer as a

result of smoking was the same as someone who never smoked." *Id.* at 247. The

expert also sought to offer opinions concerning potential alternative causes of the

decedent's cancer: "that the decedent had a strong family history of cancer," which

"was much more important in causing his laryngeal cancer as compared with his

smoking"; and also "that the decedent had a very significant asbestos exposure." *Id.*

11

"When asked if he could testify before the jury with any reasonable degree of medical certainty as to what caused the decedent's cancer, [the defendant's expert] replied, 'Well, I can say this: It had – it had more of a role than his declining risk of tobacco.'" *Id.*

The trial court in *Mack* excluded the defendant's proffered testimony, and a jury returned a plaintiff's verdict. The court of appeals reversed. It explained:

> Appellee, as the plaintiff below, had the burden of proof with regard to the causation of the decedent's illnesses. By excluding Appellant's alternative causation evidence on the basis that its experts could not testify to a reasonable degree of medical probability, the trial court improperly shifted the burden of proof as to causation to Appellant. Contrary to the trial court's reasoning, ***Appellant was not attempting to prove that something else caused the decedent's laryngeal cancer. Instead, it was attempting to diminish Appellee's expert testimony that smoking was the probable cause of the cancer by introducing other possible causes that were pertinent to the decedent's situation***.
>
> Our conclusion that the trial court improperly shifted the burden to Appellant is supported by the majority of courts that have addressed this issue.

*Id.* at 248 (emphasis added).

In another leading case, a Pennsylvania appellate court emphasized that the purpose of alternative-cause testimony offered by a defendant is <u>not</u> to establish any affirmative proposition, but instead to impeach and rebut the plaintiff's causation evidence:

> [T]he burden of proving causation with the appropriate certainty rests upon the plaintiff. . . . The defendant ordinarily need not prove, with certainty or otherwise, that he or she is innocent of the alleged wrongdoing. Absent an affirmative defense or a counterclaim, the defendant's case is usually nothing more than an attempt to rebut or discredit the plaintiff's case. Evidence that rebuts or discredits is not necessarily proof. It simply vitiates the effect of opposing evidence. Expert opinion evidence [suggesting alternative causes of an injury] . . . certainly affords an effective means of rebutting contrary expert opinion evidence, even if the expert rebuttal would not qualify as proof.

*Neal by Neal v. Lu*, 530 A.2d 103, 109–10 (Pa. Super. 1987) (citations omitted); quoted and followed in, *e.g.*, *Jacobs v. Chatwani*, 922 A.2d 950, 961 (Pa. Super. 2007).

Multiple other cases similarly endorse the presentation of such alternative-causation evidence. These cases hold that alternative-causation evidence offered by a defendant in a medical malpractice or personal-injury case is admissible, even if the defense expert does not definitively identify an alternative cause of the plaintiff's injuries to a reasonable degree of medical certainty. They reason, like the cases described above, that a defendant does not bear the burden of proving an alternative cause for a plaintiff's injuries by a preponderance of the evidence, but can instead simply cast doubt on a plaintiff's evidence by informing the jury of alternative causes which <u>may</u> have produced the plaintiff's injuries. *See, e.g.*, *Aycock v. R.J. Reynolds Tobacco Co.*, 769 F.3d 1063, 1070 (11th Cir. 2014) (Florida law); *Allen v. Brown Clinic, P.L.L.P.*, 531 F.3d 568, 574–75 (8th Cir. 2008) (South Dakota law); *Benkendorf v. Advanced Cardiac Specialists Chtd.*, 269 P.3d 704, 706–09 ¶¶ 9-17 (Ariz. App. 2012); *Williams v. Eighth Judicial Dist. Ct.*, 262 P.3d 360, 368–69 (Nev. 2011) (followed in *Leavitt v. Siems*, 330 P.3d 1, 5-6 (Nev. 2014)); *Roy v. St. Lukes Med. Ctr.*, 741 N.W.2d 256, 264 ¶ 20 (Wis. App. 2007); *Larson ex rel. Millam v. Nelson*, 110 Wash. App. 1002, 2002 WL 77763 at *8-*9 (2002); *Sakler v. Anesthesiology Assocs., P.S.C.*, 50 S.W.3d 210, 212-13 (Ky. App. 2001); *Davis v. Chism*, 513 P.2d 475, 484–85 (Alaska 1973); *see also* 57A AM.JUR.2D, NEGLIGENCE § 441 (2020) ("To convince the trier of fact that the alleged negligence is not the legal cause of the injury, the defendant may produce other possible causes of the plaintiff's injury; these possible causes need not be proved with certainty or more probably than not.").

The only appellate case endorsing the Lintons' position of which I am aware – decided <u>anywhere</u> in the United States – is *Hunter v. Ura*, 163 S.W.3d 686, 703-04

13

(Tenn. 2005). *Hunter* is an outlier, and was decided by a closely divided 3-2 vote. I find the dissent persuasive when it argues:

> Alternative theories of causation, when presented by a qualified expert and supported by the current state of medical or scientific knowledge in the relevant field, serve to educate the jury as to other potential causes of the plaintiff's injury. Presenting such evidence allows the defendant to "test" the plaintiff's case and assists the jury in understanding the full import of the plaintiff's proof before assigning weight to the evidence and ultimately determining factual issues.

*Id.* at 715. It is significant that, in *Hunter*, the majority merely held that the trial court had not abused its discretion by excluding the defense's evidence of other potential causes, *id.* at 703; the court did not reverse a trial court's discretionary decision to *admit* such testimony. The majority's decision in the present case will hold the distinction of being the only appellate decision in America to reverse a defense verdict based on the trial court's admission of testimony like Dr. Rhine's.

**C.**

The majority's justifications for refusing to follow the Missouri Supreme Court's controlling decisions in *Lands* and *Kimmie* are unpersuasive.

First, the majority notes that *Lands* predates the enactment of § 490.065.2, RSMo. But that is irrelevant. The Lintons do not challenge the admission of Dr. Rhine's testimony on the basis that it fails to satisfy the statutory standards. Thus, they do not argue: that Dr. Rhine was unqualified to give opinions concerning the potential causes of periventricular leukomalacia, § 490.065.2(1); that the causes of this type of brain injury are generally known by laypersons, or that Dr. Rhine's testimony would not "help the trier of fact to understand the evidence," § 490.065.2(1)(a); or that Dr. Rhine's opinions are not based on sufficient facts or data, that he relied on unreliable principles or methods, or that he failed to reliably apply those principles or methods. § 490.065.2(1)(b)-(d). The Lintons' arguments are not based on § 490.065.2. The fact that the *Lands* decision predates that statute is neither here nor there.

14

The majority also points out that *Lands* was a general negligence case, not a medical malpractice case like this one. The majority emphasizes that general negligence and medical malpractice cases are governed by differing standards of care. But this is likewise irrelevant. The Lintons are not challenging testimony by Dr. Rhine concerning *the standard of care*; they are challenging his testimony concerning *causation*. The majority cites no authority for the proposition that the standards for expert *causation* testimony differ between medical malpractice cases, and other cases where complex questions arise concerning the causation of a particular bodily injury.

Ironically, most of the cases which the majority cites to establish the relevant standards for expert causation testimony *are not medical malpractice cases. See Payne v. Fiesta Corp.*, 543 S.W.3d 109 (Mo. App. E.D. 2018) (negligence action for personal injuries against owner of amusement ride); *Adkins v. Hontz*, 337 S.W.3d 711 (Mo. App. W.D. 2011) (wrongful-death action against automobile driver); *Glaize Creek Sewer Dist. v. Gorham*, 335 S.W.3d 590 (Mo. App. E.D. 2011) (condemnation action brought by municipality to acquire real property for sewer line); *Thompson v. Brown & Williamson Tobacco Corp.*, 207 S.W.3d 76 (Mo. App. W.D. 2006) (strict liability and negligence action against cigarette manufacturer for injuries caused by smoking); *Shackelford v. West Cent. Elec. Coop., Inc.*, 674 S.W.2d 58 (Mo. App. W.D. 1984) (negligence action against electric utility for property damage caused by house fire); *Bertram v. Wunning*, 385 S.W.2d 803 (Mo. App. 1965) (negligence action for personal injuries arising from automobile accident); *Hunt v. Armour & Co.*, 136 S.W.2d 312 (Mo. 1939) (action against employer for personal injuries allegedly resulting from plaintiff's working conditions).

The majority's own citation to non-medical-malpractice cases to identify the standards governing expert causation testimony confirms the obvious: those standards do not vary between general negligence and medical malpractice cases.

15

The majority cannot have it both ways – it cannot on the one hand dismiss *Lands* because it "sounded in general negligence rather than medical negligence," Maj. Op. at 11, while at the same time citing general negligence cases for the relevant standards. It is also significant that the majority does not even acknowledge, or attempt to distinguish, the three Missouri *medical-malpractice cases* which apply the evidentiary principles established in *Lands* and *Kimmie*. *See Koontz v. Ferber*, 870 S.W.2d 885, 892-93 (Mo. App. W.D. 1993); *Kummer v. Cruz*, 752 S.W.2d 801, 806-07 (Mo. App. E.D. 1988); *York v. Daniels*, 259 S.W.2d 109, 122-23 (Mo. App. 1953).

The caselaw cited by the majority and by the Lintons is distinguishable, and cannot justify our disregard of the Missouri Supreme Court's holdings in *Lands* and *Kimmie*. Notably, with the exception of one land-condemnation case which is clearly distinguishable for other reasons,[1] <u>all</u> of the caselaw on which the Lintons and the majority rely involves experts testifying *on behalf of the party bearing the burden of proof* (generally, the plaintiff).[2] And, in the majority of those cases, the competence of the testimony of the plaintiff's causation experts is discussed only in connection with a challenge to the *submissibility* of the plaintiff's case.[3] It is hardly

---

[1]  In *Glaize Creek Sewer Dist. v. Gorham*, 335 S.W.3d 590 (Mo. App. E.D. 2011), the Court held that an expert should not have been permitted to opine on the fair market value of property subject to condemnation because the expert admitted that he had not applied the governing valuation standard, and "had no data or evidence to support his opinion." *Id.* at 594-95. The Lintons do not attack Dr. Rhine's testimony on these grounds.

[2]  Thus, with the exception of the *Glaize Creek* case discussed in the prior footnote, <u>all</u> of the cases cited in the majority opinion (at 8-10) state the standards for expert testimony presented by <u>the plaintiff</u>. *See Edgerton v. Morrison*, 280 S.W.3d 62, 69 (Mo. 2009); *Hunt v. Armour & Co.*, 136 S.W.2d 312, 315-18 (Mo. 1939); *Love v. Waring*, 560 S.W.3d 614, 619 (Mo. App. W.D. 2018); *Payne v. Fiesta Corp.*, 543 S.W.3d 109, 119-20 (Mo. App. E.D. 2018); *Adkins v. Hontz*, 337 S.W.3d 711, 720 (Mo. App. W.D. 2011); *Thompson v. Brown & Williamson Tobacco Corp.*, 207 S.W.3d 76, 109-11 (Mo. App. W.D. 2006); *Tompkins v. Cervantes*, 917 S.W.2d 186, 189 (Mo. App. E.D. 1996); *Wagner v. Piehler*, 879 S.W.2d 789, 792 (Mo. App. W.D. 1994); *Bertram v. Wunning*, 385 S.W.2d 803, 806-07 (Mo. App. 1965)

[3]  *See, e.g.*, *Love*, 560 S.W.3d 614 (appeal of grant of summary judgment to physician-defendant, based on insufficiency of the plaintiff's causation evidence); *Payne*,

16

surprising that these cases state that the plaintiff must present evidence which establishes, to a reasonable degree of medical certainty, that a circumstance or event for which the defendant is liable actually caused the plaintiff's injuries. These statements of the standard for admissibility of expert causation evidence are necessarily bound up with the burden of proof the plaintiff shoulders to make a submissible case. But those standards have no applicability to *a defendant's* experts, since a defendant has no burden to prove *anything*.

The fact that the majority's cases involve a different issue is illustrated by the majority's citation of *Mueller v. Bauer*, 54 S.W.3d 652 (Mo. App. E.D. 2001), for the proposition that, "'[w]here an expert's testimony is mere conjecture and speculation, it does not constitute substantive, probative evidence on which a jury could *find ultimate facts and liability*.'" Maj. Op. at 12 (quoting *Mueller*, 54 S.W.3d at 657 (emphasis added)). But the Respondents did not ask the jury to rely on Dr. Rhine's opinions to "find ultimate facts" in their favor. They didn't need to – *the Lintons* bore the burden of proving causation. It was not necessary for the jury to <u>*find*</u> any facts in the Respondents' favor in order to return a defense verdict. Instead, the jury was merely required to find that the Lintons had failed to satisfy <u>*their*</u> burden of proof as to one or more elements of their claim.

---

543 S.W.3d at 119 ("Fiesta argues that if Dr. Levy's testimony was properly excluded, Respondent would have failed to make a submissible case" on causation of plaintiff's injury (citation omitted)); *Edgerton*, 280 S.W.3d at 69 (addressing physician-defendant's claim that "it was error to deny his motions for directed verdict and JNOV because Patient failed to present [competent] evidence of a causal connection between his injury and Surgeon's alleged negligence"); *Thompson*, 207 S.W.3d at 109 (addressing competence of plaintiff's causation testimony in connection with defendant's claim that plaintiff failed to make a submissible case); *Tompkins*, 917 S.W.2d 186 (appeal of grant of summary judgment to defendant); *Shackelford*, 674 S.W.2d at 62-63 (addressing admissibility of plaintiff's expert testimony and, because of defects in that testimony, concluding that directed verdict should have been entered for defendant); *Bertram*, 385 S.W.2d 803 (because of defects in plaintiff's causation evidence, holding that circuit court should have issued withdrawal instruction advising jury not to award damages for that injury); *Hunt*, 136 S.W.2d at 319 (ruling that defendant's demurrer to the evidence should have been granted due to inadequacy of plaintiff's causation evidence).

17

## III.

On appeal, the Lintons do not make any broad legal arguments; instead, their arguments boil down to a dispute concerning how Dr. Rhine's trial and deposition testimony should be interpreted and reconciled. This is an enormously fact- and record-specific question on which we should defer to the circuit court's exercise of its discretion.

At oral argument, the Lintons' counsel conceded that, if Dr. Rhine had testified to a reasonable medical certainty that Nicholas' injuries were caused by an identified list of factors, acting alone or in combination, that testimony *would be admissible*. Rather than arguing broadly that possible-cause testimony is categorically inadmissible, the Lintons have instead argued only that Dr. Rhine failed to give <u>his</u> testimony concerning possible alternative causes to a reasonable degree of medical certainty.

As described above in § I, at trial Dr. Rhine gave exactly the type of testimony which the Lintons concede is admissible: he testified *to a reasonable degree of medical certainty* that one or more of the specific factors he identified had caused Nicholas' brain injury. In the circuit court, and on appeal, the Lintons have disputed that Dr. Rhine testified with the requisite certainty. To make this argument, they rely heavily on a colloquy from Dr. Rhine's deposition in which – they contend – he admitted that he could not give competent alternative causation testimony.

The circuit court, in its discretion, could properly conclude that the deposition testimony on which the Lintons rely did not render Dr. Rhine's possible-cause testimony inadmissible. In the passage on which the Lintons heavily rely (which is quoted in the majority opinion), Dr. Rhine gave the following testimony:

> Q.     Do you have an opinion based upon a reasonable degree of medical certainty as to whether Nicholas Linton suffered

18

periventricular leukomalacia or injury to the white matter of his brain before birth?

A.   No.

Q.   Do you have an opinion based upon a reasonable degree of medical certainty as to whether he suffered injury . . . periventricular leukomalacia or injury to the white matter in his brain after the birth?

A.   No.   I know it's one of the two. I know it's one of the two, either before or after or a combination.

Q.   Do you have an opinion that you can state to a reasonable degree of medical certainty whether it is before or after or a combination?

A.   Nope.

In the penultimate answer during this colloquy, Dr. Rhine testified that "I know it's one of the two, either before or after or a combination." But in his final answer, Dr. Rhine stated that he could not testify to a reasonable degree of medical certainty "whether it is before or after or a combination."

The Lintons argue that in the final quoted answer, Dr. Rhine _admitted_ that he could not offer an alternative causation opinion to a reasonable degree of medical certainty. Given this purported admission, they contend that Dr. Rhine's alternative causation opinions were incompetent, and should have been excluded.

At trial, however, Dr. Rhine offered an explanation for his deposition testimony. "I interpreted your question as, can you tell me which of those three options it was and I told you then and I'm telling you and the jury now that I can't." Tr. 1489:20-24. Thus, Dr. Rhine interpreted the Lintons' deposition question as asking whether he could opine if A _or_ B _or_ C caused Nicholas' injury; because he could not choose among the three, he answered "Nope."

The explanation Dr. Rhine offered at trial for his answer to the final quoted deposition question is consistent with his answer to the immediately preceding question, in which he testified – seemingly unambiguously – that "I know it's one of the two, either before or after or a combination." Indeed, the Lintons' interpretation

19

of the final answer renders Dr. Rhine's answer to the penultimate question meaningless.

The circuit court evidently accepted Dr. Rhine's explanation for his deposition testimony, since it concluded that Dr. Rhine's deposition did not render his alternative-cause testimony inadmissible. Whether to accept Dr. Rhine's explanation, or whether to instead interpret his deposition as the Lintons advocate, is the sort of fact-specific, discretionary determination on which we should defer to the circuit court. Particularly with the results of a two-week jury trial hanging in the balance, I see no justification for this Court to second-guess the circuit court's eminently reasonable reading of Dr. Rhine's deposition. And, putting the deposition testimony to one side, the Linton's have conceded that Dr. Rhine's _trial_ testimony concerning potential alternative causes, which was undeniably given to a reasonable degree of medical certainty, was competent and admissible.

**IV.**

For the reasons explained in detail above, the circuit court did not abuse its discretion in admitting Dr. Rhine's possible-cause testimony. But even if the circuit court had erred, the admission of that testimony would not require reversal.

As described in § I, above, Dr. Rhine's possible-cause testimony was only a small part of the testimony he offered at trial. The main focus of Dr. Rhine's testimony was to opine that Nicholas' brain injury was _not_ caused by hypoxia during the birth process, and to explain why he believed that the Lintons' experts' causation opinions were unsupported by, and even contrary to, the clinical evidence. Only after offering his refutation of the Lintons' causation theory did Dr. Rhine _then_ offer opinions concerning potential other explanations for Nicholas' brain injury. In offering those opinions, Dr. Rhine made clear that he could _not_ identify a single, unique cause to a reasonable degree of medical certainty, but that he could only

20

identify a constellation of factors which had caused Nicholas' injury, acting alone or in combination.

Given the limited extent, and qualified nature, of Dr. Rhine's possible-cause testimony, that testimony could not have had a decisive effect on the jury's verdict. This was a two-week trial in which the Respondents presented _five_ separate causation experts. It is unrealistic to ascribe substantial prejudicial effect to a minor portion of the testimony of just one of those five experts.

Any possibility of prejudice is defeated by the fact that another defense expert, Dr. Paul Levinsohn, offered alternative-cause testimony similar to Dr. Rhine's, with no objection by the Lintons. Thus, Dr. Levinsohn testified on direct examination:

> Q.    Okay. So let's talk about other evidence of what might have caused injury. We have talked about birth asphyxia not being the cause of this, correct?
>
> A.    Correct.
>
> Q.    So what other evidence did you find in your review of the records that points to other potential causes?
>
> A.    Well, if it is not related directly to birth asphyxia, then it was either due to something that happened before birth in utero when the baby was still developing or something that occurred postnatally, after birth while the child was being treated in the Intensive Care Unit after he was born. The evidence of the latter, or it being something that occurred afterwards is a report of low blood pressure on occasion and also the occurrence of low carbon dioxide levels, which goes along with being over-ventilated. Both of these features have been associated with subsequent direct development of periventricular leukomalacia, but there is also a possibility of more than one cause, and it could have been something prenatal. For instance, not enough oxygen getting into the baby's blood from the mother, the placenta isn't working well or maternal infection or there are other things it could be. So it is hard to say it's one or the other, but it is clearly not something that occurred at birth and it could be one or both post-natal or intrauterine injury.
>
> Q.    And you hold that opinion with reasonable medical certainty, Doctor Levinsohn?

21

A.     I do.

Tr. 1524:5-1525:14.

Dr. Levinsohn then continued by testifying that an abnormally small or dysfunctional placenta "could be the cause, or one of the causes of the baby['s] problems." Tr. 1526:13-23. Dr. Levinsohn was also shown a record of Nicholas' blood-pressure readings shortly after his birth; he agreed with counsel that "this period of low blood pressure here that we're looking at . . . [was] long enough to create the injury that we see on Nicholas' M.R.I. a year later." Tr. 1529:10-16. Dr. Levinsohn also testified that Nicholas' low carbon dioxide readings after his birth could have caused his brain injury, since the low carbon dioxide "also causes ischemia, that is a lack of adequate blood flow to the structures of the brain." Tr. 1530:7-12.

Dr. Levinsohn's direct examination concluded by emphasizing his opinion that Nicholas' brain injury was caused by circumstances existing *in utero*, or subsequent to his birth, but <u>not</u> during the eighteen minutes between the rupture of the amniotic sac and his delivery:

> Q.     Okay, and from the standpoint of now having identified the things that are in the record, do you have an opinion with reasonable medical certainty as to whether both the prenatal and the postnatal causes or likely causes of Nicholas' –
>
> A.     This brain injury was a result of either in-utero problems or post-natal, problems without adequate blood flow to the brain. And it could be both of them that are contributing or it could be only one of them. There is no way of knowing that. We don't have text [*sic*] that allows us to know which one it is. We don't have the neonatal encephalopathy and we know that the baby suffered respiratory problems, so that leads us only with two places to go. Therefore either before he was born in-utero or after he was born as a neonatal injury would be identifiable causes that we have looked at.
>
> Q.     And the identifiable causes are totally sufficient to have caused this?
>
> A.     They are.

22

> Q.    And you hold those opinions with reasonable medical certainty?
>
> A.    I do.

Tr. 1530:13-1531:12. These are *the exact same opinions* which the Lintons now challenge – when expressed by Dr. Rhine.

The Lintons could not have been prejudiced by the admission of Dr. Rhine's testimony, when Dr. Levinsohn testified – without objection – to the same alternative-causation opinions. "A party cannot be prejudiced by the admission of allegedly inadmissible evidence if the challenged evidence is merely cumulative to other evidence admitted without objection." *Swartz v. Gale Webb Transp. Co.*, 215 S.W.3d 127, 134 (Mo. 2007) (citations omitted); *accord Gateway Foam Insulators, Inc. v. Jokerst Paving & Contracting, Inc.*, 279 S.W.3d 179, 189 (Mo. 2009).[4]

To bolster its claim that the admission of Dr. Rhine's testimony was prejudicial, and mandates a new trial, the majority vastly overstates the significance of Dr. Rhine's testimony. It is simply inaccurate to assert that "[t]he Respondents rebutted [the Lintons' causation] evidence largely through the testimony of Dr. Rhine." Maj. Op. at 14. Dr. Rhine was one of *five* physicians who

---

[4]    *Swartz* recognizes that objections to later, similar evidence are not required "when testimony on a particular subject is objected to the first time it is offered and the court makes clear that it is rejecting the objection to all evidence of the same type. In such cases, a failure to specifically object to each later piece of similar testimony may be forgiven on the basis that further objection would have been futile." *Swartz*, 215 S.W.3d at 133 (citations omitted). In the present case, however, the Lintons' objections were always targeted specifically – and solely – against Dr. Rhine's testimony. The Lintons' objections were based in large part, if not exclusively, on Dr. Rhine's deposition testimony in which he purportedly admitted that he could not give alternative-cause testimony to a reasonable degree of medical certainty. The circuit court's rejection of the Lintons' objections to Dr. Rhine's alternative-cause testimony says nothing about how the court would have ruled on an objection to similar testimony from Dr. Levisohn. *See State v. Gott*, 523 S.W.3d 572, 578 n. 5 (Mo. App. S.D. 2017) (exception to contemporaneous objection requirement "does not apply here because the trial court did not make clear that it was rejecting the objection to all evidence of the same type when it overruled Defendant's objection to [earlier, similar] testimony").

testified on causation issues for the defense. The testimony of each of those experts was intended to rebut the Lintons' causation theories.

The majority also claims that prejudice is established because "Dr. Rhine's testimony was central to the Respondent's negation of the causation element and extensively highlighted by the Respondents during closing arguments." Maj. Op. at 16. These characterizations are likewise inaccurate. Three different attorneys made closing arguments on behalf of the Respondents, and together they spoke for well over an hour. In those extensive arguments, Dr. Rhine's testimony was referenced only *twice*. Each time, counsel emphasized that Dr. Rhine had *rejected* the Lintons' claim that Nicholas' injury occurred during the birthing process; counsel then referred only generally to Dr. Rhine's identification of other possible causes. Thus, the first time Dr. Rhine's testimony was mentioned in closing, counsel argued:

> Doctor Rhine from Stanford, a Neonatologist with decades of experience. I point out that the plaintiff did not call a Neonatology, only defense. He explained also that the injury was not caused between 12:17 and 12:35, which is all we need to do. These gentlemen think about this stuff and they've come up with more likely explanations, but looking at the medical evidence, he said that this white matter injury, the prematurity itself was most likely the cause. It wasn't anything that happened in that time period, for all of the reasons that he said. But I don't have time to go over all of those.

Tr. 1817:17-1818:4. The second reference was similar (and grouped Dr. Rhine's testimony with the testimony of Dr. Levisohn, to which the Lintons did not object):

> I would encourage you all to listen – Number one to the only Neonatologist who testified in this case, Doctor Rhine, to our Pediatric Neurologist, Doctor Levisohn, who told you that the evidence in this case is that Nicholas did not have symptoms, did not have neurologic syndrome at birth, and therefore did not suffer an intra-birth or a birthing process injury to his brain. What is more likely, you remember the blood pressures we showed you. Remember the low pCO2 on the second day of life. Those are much much more likely, as you've heard the testimony, factors that would be included in analyzing why Nicholas has periventricular leukomalacia today.

24

Tr. 1844:2-15.  These limited references belie the majority's claim that Dr. Rhine's testimony was somehow the centerpiece of the defense case.

**Conclusion**

The judgment of the circuit court should be affirmed.  The court did not abuse its discretion in admitting the testimony of Dr. William Rhine concerning other potential causes of Nicholas Linton's brain injury.  That testimony was expressly authorized by two controlling decisions of the Missouri Supreme Court, by a host of later Missouri cases which follow them, and by the overwhelming weight of authority across the country.  Even if admission of Dr. Rhine's testimony was erroneous, its admission cannot justify reversal of a jury verdict reached after a two-week trial, where the Linton's challenge only a portion of Dr. Rhine's testimony, he was merely one of five defense causation experts, and where another defense expert offered virtually identical testimony without objection.

_____
Alok Ahuja, Judge